986 So.2d 738 (2008)
STATE of Louisiana
v.
Corey CHEATTEAM.
No. 07-KA-272.
Court of Appeal of Louisiana, Fifth Circuit.
May 27, 2008.
*739 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Anne Wallis, Roger Jordan, Jr., Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Corey Cheatteam, Kinder, Louisiana, Defendant/Appellant.
Jane L. Beebe, Attorney at Law, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and FREDERICKA HOMBERG WICKER.
FREDERICKA HOMBERG WICKER, Judge.
In this criminal matter the defendant, Corey Cheatteam a/k/a Kedric Carter, appeals his looting conviction, a violation of La.R.S. 14:62.5(B), and his 28-year habitual offender sentence. Among other pro se and counseled assignments the defendant assigned as error the trial judge's denial of former trial counsel's Batson challenges.[1] Owing to substantial omissions from the transcript of the trial proceedings, we find the appellate record so deficient that we cannot properly review this case for the alleged Batson error. Therefore, we reverse and remand for a new trial.

*740 PROCEDURAL HISTORY
The defendant was tried along with codefendants, Jimmy Carter and Allen Jones a/k/a Larry Cheatteam. After a four-day trial, a unanimous twelve-member jury found all three defendants guilty as charged. This appeal relates solely to the defendant Corey Cheatteam a/k/a Kedric Carter.[2]
Mr. William Doyle represented the defendant in the proceedings below. For appeal purposes, Mr. Doyle withdrew and the Louisiana Appellate Project was appointed as appellate counsel. On appeal, the defendant is represented by Jane L. Beebe. Ms. Beebe assigned one error challenging the denial of the motion to suppress evidence. The defendant assigned three pro se errors  excessive sentence, insufficiency of the evidence, and Batson violations.
This case was originally set on this court's October 3, 2007 docket. Due to extraordinary circumstances, we continued the matter in order to ensure the defendant his constitutional right to appellate review. La. Const. Art. 1, § 19 (right of judicial review based upon complete record); See also: Uniform Rules  Courts of Appeal, Rule 2-11.6.[3]
The defendant had filed pro se motions in the district court as early as January 2007 requesting the voir dire transcript. The voir dire had not been transcribed by the date the matter was set on this court's docket. In September 2007, the defendant filed a pro se writ seeking a writ of mandamus directing the trial court to provide him with the voir dire transcript. The defendant asserted that his major claim was Batson error and that his counsel had preserved Batson challenges. He requested the transcript in order to file a supplemental pro se brief. On October 3, 2007, this court ordered the trial court to prepare the voir dire transcript and to transmit it to the defendant. We ordered the record supplemented with the voir dire transcript.[4] We forwarded the entire record to the defendant via the correctional facility.[5]
There were further delays, however, because Mr. Vincent Borello, Jr., the court reporter, was granted five extensions to produce the voir dire transcript. We also had ordered a second voir dire transcript after noting that the first transcript appeared incomplete.
Upon reviewing the two sets of voir dire transcripts, we note that the transcribed portions are identical with the exception that the first set does not contain the voir *741 dire examination by the codefendants' counsels. Both sets are otherwise missing identical portions of the voir dire.

FACTS
A factual summary of the testimony and evidence adduced at the joint trial of the three defendants, applicable here, was presented in State v. Carter, 07-270 (La.App. 5 Cir. 12/27/07), 976 So.2d 196, 198-200 as follows:
At trial, Deputy Ryan Singleton of the Jefferson Parish Sheriffs Office testified that after Hurricane Katrina he worked twelve-hour shifts from 6:00 a.m. to 6:00 p.m., in two-manned cars due to sporadic communication capabilities, as a result of the hurricane. He patrolled to protect the public and remaining businesses from criminal activity. At the time, the businesses in the area did not have normal security. The alarms did not work because the electricity was out. As officers began to quit after the hurricane, the Sheriffs Department was no longer able to patrol in two-man units. According to Deputy Singleton, this put the officers on patrol in danger and at greater risk of injury or death. Therefore, the Sheriffs Department utilized the assistance of personnel from outside agencies, as sworn special deputies. During the week of September 3, 2005, Deputy Singleton was assisted by Captain Kevin Hinsley and Canine Deputy Elmore Horn. Both officers were from Douglas County, Georgia.
On the morning of September 2, 2005, Deputy Singleton discovered that the Burlington Coat Factory ("Burlington") had been broken into and looted after his shift on the previous day. However, there were still items remaining in the store.
On the morning of the next day, September 3, 2005, Deputy Singleton was in his police vehicle patrolling in the Harvey-Gretna area with the Douglas County officers, when he saw three black males exiting Burlington. Each of the three men had a backpack. He was able to see the faces of the men and the clothing they wore. When the men saw him, they ran. He was unable to follow quickly behind them in his vehicle, because of all the debris. He theorized that the three men went into a convalescent home behind Burlington, because he did not see them running down the street. He checked the area for the men, but he did not find them.
Thirty minutes to an hour later while he was patrolling on Pailet Street, in Harvey, Deputy Singleton saw the same three men that he saw exiting Burlington. They were each still carrying a backpack. Deputy Singleton opined that it would take 30 to 45 minutes to walk from Burlington to Pailet Street using the drainage canal. Deputy Singleton exited his vehicle with his weapon drawn, pointed his weapon at the three men, and ordered the men to drop the backpacks. The three men complied. The Douglas County officers also exited their vehicle with their weapons drawn. Then, Deputy Singleton conducted a pat down search for weapons. No weapons were found on the three men. Deputy Singleton also searched the backpacks carried by the three men for weapons. While going through the backpacks, Deputy Singleton noticed that the backpacks were from Burlington and the backpacks all contained tagged items of merchandise from Burlington. He counted 26 items in total, including several t-shirts, a pair of shorts, and a pair of brown Nike's. All of the items found had price tags on them. The value of all the Burlington merchandise totaled $368.00. Deputy Singleton did not separately inventory *742 the items in each backpack. Deputy Singleton placed the subjects under arrest for looting. Thereafter, he returned the merchandise to Burlington, because the Sheriffs department had no services available to photograph or to seize and store the items.
While Deputy Singleton was searching the backpacks, 15 to 20 people were yelling obscenities at the officers from a nearby apartment complex. In response, the Douglas County officers took a position between the apartment complex and Deputy Singleton to protect him.
Deputy Singleton testified in court that he had no doubt in his identification of the defendant and his codefendants as the three men that he saw leaving Burlington, that he later stopped with backpacks and merchandise from Burlington, and that he arrested.
Captain Hinsley and Deputy Horn both testified that their duty was to backup the Jefferson Parish Sheriff Department officers, while volunteering in Louisiana after the hurricane. Officers Hinsley and Horn worked in two-man 12-hour shift patrols following Deputy Singleton from 6:00 a.m. to 6:00 p.m. Captain Hinsley testified that he drove their Douglas County police vehicle behind Deputy Singleton's department vehicle. They drove with their police lights on and stayed within eyesight of Deputy Singleton, because they were unfamiliar with the area. According to Deputy Horn, they were usually within one to 10 car-lengths behind Deputy Singleton's car.
On the morning of September 3, 2005, Officers Hinsley and Horn again followed Deputy Singleton. Neither of the Douglas County officers saw the individuals coming out of Burlington.
Officers Hinsley and Horn provided backup when Deputy Singleton arrested three men in the 1600 block of Pailet Street. They did not participate in the search of the defendants or the backpack. They secured the scene in order to make sure their safety and that of Deputy Singleton was not jeopardized, as several people on a nearby porch began to come downstairs and approach them. Neither Deputy Horn nor Captain Hinsley could identify the defendant or the codefendants, in court, as the same men who were arrested by Deputy Singleton, on September 3, 2005. Deputy Horn only remembered that one of the men had dreadlocks that poked out from his hat.
Hao Nguyen, the store manager for the Burlington located on Manhattan, in Harvey, testified that the store was in normal condition, on Saturday, August 27, 2005. The four front doors of the store were locked and boarded with wood, in order to secure them for the impending hurricane. When Nguyen returned after Labor Day, a week after the storm, he surveyed the store and found the front entrances to the store were broken into. The hinges on the inside iron gate were broken at the wall, and the right door was broken. Some merchandise had been taken, and some merchandise had been strewn on the floor. Nguyen testified that he did not know any of the codefendants, and had not given them or anyone permission to enter and take merchandise either during or after the hurricane, on September 3, 2005.
Codefendant Larry Cheatteam a/k/a Allen Jones testified that at approximately 9:00 a.m., on September 3, 2005, he and the codefendants were going to his uncle's residence, on Pailet Street. As they neared his uncle's residence, the police came behind them. Deputy Singleton *743 jumped out of his vehicle with his gun already pointed at them. He ordered them onto the ground. They complied. The other two officers also got out of their vehicle. Then, the officers cocked their shotguns and pointed them in their direction. When Cheatteam's cousin approached from down the street to inquire about the situation, Deputy Singleton pointed his weapon at his cousin. Deputy Singleton talked to his cousin, then informed Cheatteam and the other two men that they were going to jail for looting. Cheatteam testified that when he asked Deputy Singleton to define looting, he refused. Cheatteam testified that he did not go into Burlington and put clothes in a backpack, and then run out of the store. In addition, he did not have a backpack containing merchandise from Burlington when he was stopped and subsequently arrested. Cheatteam admitted that he was wearing a hat and his hair was in dreadlocks when he was stopped by the police, on September 3, 2005. However, he denied that he and the codefendants looted Burlington on that date.
The defendant [Corey Cheatteam] did not testify.

DISCUSSION

FROM BATSON TO MILLER-EL[6] AND SNYDER[7]: MILLER-EL'S AND SNYDER'S EFFECT ON THE LEGAL LANDSCAPE SURROUNDING BATSON ISSUES
The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In Batson, the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of a prospective juror were based on race. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Batson, 106 S.Ct. at 1723. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Batson, 106 S.Ct. at 1723-24. This second step "does not demand an explanation that is persuasive or even plausible," as long as the reason is not inherently discriminatory, it suffices. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam). Third, the court must then determine whether the defendant has established purposeful discrimination. Batson, 106 S.Ct. at 1724. It is at this third step that implausible explanations offered by the prosecution "may (and probably will) be found to be pretexts for purposeful discrimination." Purkett v. Elem, 115 S.Ct. at 1771. "[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." Snyder v. Louisiana, ___ U.S. ___, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008), citing Hernandez v. New York, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991).
The Supreme Court later affirmed and applied the three-part test in Miller-El v. Dretke, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005), and, most recently, in Snyder v. Louisiana, supra. In Miller-El, the Supreme Court emphasized the trial judge's responsibility to assess the plausibility of the prosecutor's *744 proffered race-neutral reason "in light of all evidence with a bearing on it." Miller-El, 125 S.Ct. at 2331. The Supreme Court further stated:
A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.
Miller-El, 125 S.Ct. at 2332.
In its most recent case, Snyder v. Louisiana, supra, the Supreme Court again emphasized that the plausibility of the prosecutor's explanation for a peremptory strike is to be carefully scrutinized by the trial judge under the third step of the Batson inquiry and noted that implausible reasons will fail a Batson challenge. In discussing the third step of the Batson inquiry in Snyder, the Supreme Court stressed the trial judge's pivotal role in determining the plausibility of the state's race-neutral explanation. The Supreme Court explained that the third step requires the trial court to evaluate the prosecutor's credibility by assessing "not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." Snyder v. Louisiana, ___ U.S. ___, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008).
Referencing its earlier decision in Miller-El, the Supreme Court again stressed that "all of the circumstances that bear upon the issue of racial animosity must be consulted" in determining whether the explanation given for the strike is convincingly race-neutral. Snyder v. Louisiana, supra at 1208. When the record does not support the prosecutor's proffered explanation or shows the proffered explanation to be implausible, there is an inference of discriminatory intent that sufficiently demonstrates a Batson violation. Id. at 1212.

UNDERLYING FACTS: VOIR DIRE EXAMINATION
In the present case, according to the existing transcript, the trial judge called six panels of prospective jurors. Defense counsels asserted timely Batson challenges[8] to each of eight African-American venirepersons that the prosecutor peremptorily struck.[9]
After defense counsel made Batson challenges to the prosecutor's striking Panel 2's Ms. Karen Daggs and Ms. Orelia Lemar, the trial judge denied the Batson claims because she found no pattern of racial discrimination at that time. Likewise, when defense counsel raised Batson challenges to Panel 3's Ms. Leona Smith (via Batson backstrike) and Mr. Herbert Gaines, the court also found no pattern and denied the challenges. But, she placed the prosecutor on notice that if another African-American venireperson were struck, she would find a pattern and require the prosecutor to provide reasons. The prosecutor, however, provided his reasons for striking these venirepersons. Then, when the prosecutor exercised its next peremptory challenge to Panel 3's Ms. Alicia Detiege, the court found a pattern and required an explanation for all *745 Batson challenges. Thereafter, when the state exercised a peremptory challenge as to Ms. Darla Brown (Panel 5), defense counsels objected and Mr. Netterville, codefendant Mr. Jones' counsel, pointed out that the state's strikes were significantly skewed in favor of non African-Americans. He indicated that the prosecutor peremptorily struck 83% or five out of six eligible African-Americans but only 14% of eligible non African-Americans or six out of 42. Mr. Netterville noted that the statistics warranted retaining Ms. Brown.
After voir dire of the sixth panel was completed, the prosecutor exercised a peremptory challenge to Fred Belmar (Panel 6). Defense counsels lodged a Batson objection. Defense counsels again pointed out that the jury was significantly skewed in favor of non African-Americans. They pointed out that it appeared the prosecutor was attempting to ensure that only two African-Americans would serve on the jury. And in order to convict, the prosecutor needed only 10 votes.

BATSON ASSIGNMENTS
On appeal, the defendant argues that the prosecutor engaged in deceptive questioning in order to exclude African-Americans from serving on the jury. He asserts that the prosecutor engaged in disparate treatment of African-Americans because the prosecutor failed to challenge non African-American prospective jurors who expressed similar views. He argues that African-American jurors, unlike their non African-American counterparts, were badgered by infinite questioning. He points to side-by side comparisons of alleged African-American and non African-American prospective jurors. He also argues the trial court erred in finding that he failed to establish purposeful racial discrimination and in finding that the state's alleged racially-neutral explanations were sufficient with regard to prospective jurors Ms. Brown, Ms. Smith, and Mr. Gaines.

Alleged Deceptive Questioning
In essence, the prosecutor's questions throughout the voir dire focused on three areas: (1) Could you convict on police officer testimony alone? (2) Could you convict on one police officer's testimony alone? (3) Would you want or expect more evidence, for example, videotapes and fingerprints? (4) What are your thoughts or feelings about police officers in general and before, during, and after the storm?
The defendant asserts that the prosecutor's questions regarding whether the prospective juror could convict on one police officer's testimony alone was deceptive because the evidence at trial consisted of testimony from three police officers rather than one. He contends that the state set the stage for what it knew would open the door to exclude all undesirable African-Americans.
Defense counsel, however, did not object to this line of questioning, nor did he ask for a mistrial. A defendant waives his right to review of irregularities in the selection of the jury when no objection is lodged in a timely manner. State v. Demise, 98-0541 (La.4/3/01), 802 So.2d 1224, 1233, cert, denied, Demise v. Louisiana, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001) (Citations omitted).
But even assuming counsel had objected, there is no merit to the argument. The question was not deceptive. Although three police officers testified at trial, only one officerDeputy Ryan Singletonactually observed the three codefendants run from him after they exited the store carrying backpacks. Thus, the questioning did not taint the jury pool with a misconception regarding the testimony. The prosecutor was entitled to question prospective *746 jurors as to any bias they might have concerning police officer testimony. Therefore, the deceptive-questioning aspect of the pro se assignment lacks merit.

Incomplete Voir Dire Transcript
There is a potentially reversible Batson violation as to Ms. Brown but because of the incomplete record of the voir dire, we cannot review the issue. Furthermore, because we find that there is a potentially reversible Batson violation as to Ms. Brown, which we cannot review, we have no need to consider the defendant's other claimed Batson violations. See, Snyder v. Louisiana, supra, 128 S.Ct. at 1207 citing U.S. v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir.1994), cert. denied, Vasquez-Lopez v. U.S., 513 U.S. 891, 115 S.Ct. 239, 130 L.Ed.2d 162 (1994) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose").
The defendant makes a two-pronged argument. He argues that the trial judge erred in finding the prosecutor's race-neutral reason sufficient with regard to his strike of Ms. Brown. He also argues that a side-by-side comparison of Vanessa Williams (Panel 5) with Ms. Brown (Panel 5) shows disparate treatment of Ms. Brown in comparison with Ms. Williams, an alleged non African-American prospective juror. In particular, he argues that both potential jurors answered they found some police bad and some good. We find the record so deficient that we cannot review the defendant's claim that the prosecutor's race-neutral reason was insufficient.
La. Const. Art. 1, § 19 provides:
No person shall be subjected to imprisonment or forfeiture of rights or property without the right of judicial review based upon a complete record of all evidence upon which the judgment is based. This right may be intelligently waived ...
La.C.Cr.P. art. 843 pertinently states:
In felony cases ... the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
Moreover, in criminal proceedings, the court reporter shall record all portions of the proceedings required by law and shall transcribe those portions of the trial proceedings required. La.R.S. 13:961(C).
The Louisiana Supreme Court and the United States Supreme Court have made clear that a criminal defendant has a right to a complete transcript of the trial proceedings, particularly where, as in this case, appellate counsel was not counsel at trial. State v. Boatner, 03-485 (La.12/3/03), 861 So.2d 149, 152 (Citations omitted).
Material omissions from trial court proceedings bearing on the merits of an appeal require reversal. State v. Boatner, 03-485 (La.12/3/03), 861 So.2d 149, 153. However, a "slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal" does not require reversal of a conviction. Id., quoting State v. Brumfield, 96-2667 (La.10/28/98), 737 So.2d 660, 669, cert, denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999); State v. Parker, 361 So.2d 226, 227 (La. 1978). A defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcript. Id.
In this case, a missing portion of the transcript occurs during the examination of the fifth panel. In the second set of *747 transcripts, the court reporter stated that the beginning portion was not included in the transcript due to a defective tape.[10] An examination of the transcript reveals that a significant portion of the fifth panel's voir dire is missing. The transcribed portion begins with the trial judge excusing Ms. Manzella, who was in obvious pain. Afterwards, the trial judge stated: "Mr. Jordan [prosecutor], it was your panel." (Emphasis added). At this point in the transcript Mr. Jordan stated:
Now, I was with Mr. Schneider and we were discussing police officer testimony and I was explaining how I can't go into the facts of the case ... With that, I was letting you know that I have police officer testimony. So my first question to you is can you listen to police officer testimony and if the case can be proven through police officer testimony by testimony allowed on the stand, could you come back with a verdict on that.
(Emphasis added).
Mr. Carl Schneider, Jr. responded: "What I said before lunch was ... So, the answer is yes. (Emphasis added).
The speakers' reference to a previous discussion indicates that the opening portion of prosecutor Jordan's voir dire examination is missing. In addition, we also find that there is no transcription of the exercise of backstrikes, which occurred at the conclusion of the voir dire examination of Panel 5, as to Ms. Williams and Ms. Linda Middleton. The missing portion as to Ms. Middleton is not necessary for reviewing the assignment but it is mentioned here to show that the transcript is also incomplete at a later stage of the Panel 5 proceedings.
The defendant argues that a side-by-side comparison of Ms. Williams with Ms. Brown reveals the disparate questioning by the prosecutor. He asserts that the prosecutor accepted Ms. Williams but rejected Ms. Brown for similar reasons. According to the transcript, Ms. Williams was on Panel 5, the same panel as Ms. Brown.
Because of the missing transcript portion of Ms. Williams' backstrike, we cannot determine which party used a backstrike, or whether there was a Batson challenge to the strike. Furthermore, as discussed above, the transcript does not contain the entirety of the prosecutor's Panel 5 voir dire examination. Given these circumstances, there is a fatally insufficient transcript to enable us to either perform a side-by-side comparison between Ms. Brown and Ms. Williams or to even determine whether such a comparison is necessary under the circumstances.[11]
We further note that from portions of the available transcript, it appears that defense counsels were meticulous in making Batson challenges. However, these were not recorded in the court minutes.
We are mindful that Uniform Rules  Courts of Appeal, Rule 2-1.5(3), (4), and (5) only requires the minute entries to include, among other things, the list of challenges for cause, the list of peremptory challenges, and the list of petit jurors selected. The rule does not require a list of *748 Batson challenges. Still, Article 843 requires that either the clerk or the court reporter record rulings and objections. In this case, the court reporter's tape failed. Thus, since the clerk did not record the Batson challenges and rulings, the record on appeal, which originally did not contain the voir dire, provided appellate counsel with no notice of Batson challenges.
Of greater significance, however, is the missing transcript portion of the prosecutor's voir dire of the fifth Panel, which included Ms. Brown.
The colloquy between the prosecutor and Mr. Schneider indicates that the prosecutor had previously conducted questioning of the prospective jurors that was not transcribed. Thus, there is no way to determine whether he questioned Ms. Brown or any other Panel 5 members before then.
During the transcribed portion, the prosecutor asked Ms. Brown:
Ms. Brown, how about you, Police officer testimony, can you convict on police officer testimony alone? How do you feel about that?
Ms. Brown replied, "No feeling."
The prosecutor said:
No feeling. You've got to tell me something. Before the storm, how do you think officers did in general before you left.
She replied: "Some good."
The prosecutor then asked: "What was your general impression of police officers?"
She replied: "They're okay."
Then the prosecutor said:
So if the State only presented one officer that would give evidence about what happened, would you've been able to convict on that?
She replied: "It depends only if they prove."
The prosecutor asked: "What sort of evidence would you want to see?
She replied: "Proof that they did what they did."
The prosecutor asked:
Would you require anything other than the testimonial evidence? I guess I'm jumping ahead. There are two types of evidence here. There is testimonial evidence and physical evidence. The testimonial evidence is the evidence you get from the witness stand, the testimony. Physical evidence is something that you can see, like this (indicating). I'm talking to testimonial evidence. Evidence from a police officer [sic] testimony. So what else would you want besides that?
She replied: "Just them to prove it, you know, by his words. You can tell if somebody is telling the truth or not."
Later, defense counsel Mr. Soignet asked:
The District Attorney has asked each of you all, "Do you have any problem convicting withonly on the testimony of a police officer or one witness?" "He asked all of you that, right?
Either one or two prospective female jurors responded, "Right." The court reporter only indicated the name or names of these individuals by "Prospective Female Juror."
Then, Mr. Soignet asked the following of the entire jury panel:
Got to emphasize: And some of you said "Yes"; some of you said, "No, I'm not really too sure."
The point here is can you convict someone based upon the testimony of one police officer if he convinced you beyond a reasonable doubt that it occurred? *749 That's the question. Can everybody do that?
The court reporter wrote the following: "(jurors indicating)."
From the context of Mr. Soignet's next statement, the jurors indicated that they agreed that they could do so. Thus, Ms. Brown indicated that she could convict based upon the testimony of one police officer if he convinced her beyond a reasonable doubt that it occurred.
Mr. Soignet next stated:
Okay. All right. Now, if his witnesses, or whatever, comes up and he has not proven his case to you beyond a reasonable doubt, there's nothing wrong for you saying, "Well, you know, I'm not convinced beyond a reasonable doubt and, if there was some other evidence, maybe I would." Okay ...
Mr. Soignet further discussed the following with the jury panel:
... you may be fortunate to know the 10 top, best police officers in the world, but you can't base those opinions of that police officer on any other police officer.
You may have the misfortune of coming upon the only two police officers in the Jefferson Parish Sheriffs Office that you dislike for the way they behave, but you cannot hold that against any other officer just because he's an officer.
You've got to sit and listen, okay? And I'm asking you: can you sit with an open mind and just listen and let the brain cells do what they're supposed to do, take in information, grind it up, filter it, throw out the trash on one side and put in the good stuff on the other side, and then you weigh whether there's enough trash to convince you beyond a reasonablethat keeps you from being convinced beyond a reasonable doubt as to what's been said? That's what it's all about. Okay?
And can everybody do this?
Again, the court reporter noted: "(jurors indicating")." Thus, a fair reading of the record indicates that the prospective jurors, including Ms. Brown agreed that they would not hold their dislike of a police officer against any other officer but would listen and weigh the information to resolve the matter on the reasonable doubt standard.
When the prosecutor exercised a peremptory challenge as to Ms. Brown, defense counsels objected. Defense counsel Mr. Netterville stated:
The D.A. has spent an excessive amount of time talking to her about one witness testimony and attempted of what I thought to get a cause but she answered questions wonderful and correctly.
Mr. Netterville argued that the skewed strikes of African-American prospective jurors warranted retaining this juror.
The prosecutor responded:
... A lot of the jurors that we talked about previously the State has given reasons which I thought almost rose to the level of cause for several of the jurors. I asked for a peremptory challenge, not a cause challenge. I will tell you my reasons why I asked for a peremptory challenge. I asked the juror about police officer testimony. All the juror could give me was: "Some bad, some good, some bad, some good." She wouldn't elaborate on why some were bad and some were good. "Can you convict on police officer testimony?" I could not get this juror to give me why she thought there was bad police officers before the storm. There were some bad police officers, there were some good police officers. Based on the juror's body language, based on the juror's attitude toward me, based on the fact that *750 she actually rolled her eyes at me when I tried to ask her to actually give me to answer [sic] about what she thought about the police officers, that's the only thing she could come up with. I'm going to peremptorily strike this juror. I have grounds for peremptory strikes. I'm not striking her for no cause at all. It didn't rise to the level of a cause challenge, but it is a peremptory challenge.
Mr. Netterville replied:
I thought the D.A. spent a lot of time questioning her. I don't think he ever looked at her and said, "Why do you say some officers are bad?"
The trial judge then questioned Ms. Brown. She asked her "Why do you say some police officers are bad?"
Ms. Brown responded:
Well, from different things that you know, like, some of them-they on [sic] the news recently. Some of them [sic] bad, some of them [sic] good coming up with different little things that they have been doing. That's what I mean good and bad.
The trial judge asked: "So you you're talking about things you have seen on the news? Ms. Brown responded: "Yes."
The trial judge asked: "Around the Katrina time?" Ms. Brown responded, "No, before and after."
The trial judge said: "Okay. So some things you have seen on the news." Ms. Brown responded: "Yes."
The court said: "And you said some are good. Give us an example of that."
Ms. Brown replied: "Some do good things in the community, different churches and different things."
After the colloquy, the prosecutor did not pose any further questions to Ms. Brown. Counsel reurged the objection.
The court found that the prosecutor had previously given race-neutral reasons and he did so again in this instance. She said:
To me she is just not maybe a perfect juror for the State. I don't think it has anything to do with race. This is a trial about police officer testimony. You have a jury [sic] who feels that some officers are bad. I don't care what color they are. I think there is reason for the state to be suspect for a juror who blatantly says some cops are bad.
Mr. Netterville attempted to show there was disparate treatment:[12]
He stated:
Just one thing. I think that everybody on this panel would agree with that statement. And I don't see anybody disagreeing with there are some bad cops and some good cops and I think in other panels they have said that. So, *751 it's not particular to this jury, [sic] judge. 
The trial judge responded: "Well, she volunteered it. I think she was the one that blurted it out."
The prosecutor said:
When I'm asking a question, it's spontaneous answers from the perspective jury [sic] and what they give you is what is first on their mind off the top of the head. It's the best you can do with your gut feeling is what they give you off the top of their mind. To sit here and split hairs on what everybody else think
The trial judge said:
So I have found  having found a pattern yesterday, the State-I find a pattern again today as to Ms. Brown. The State has given race neutral reasons for Ms. Brown and I accept that, so I deny the Batson Challenge. I note all three defendants' objections ...
If we consider the transcript and record as it exists before this court, then the trial judge erred in denying the Batson challenge.
This case bears a striking similarity to Snyder v. Louisiana. In Snyder v. Louisiana, the defendant was convicted of first degree murder and sentenced to death. The Louisiana Supreme Court affirmed the defendant's conviction and sentence after determining there was no Batson violation during jury selection.[13]State v. Snyder, 98-1078 (La.9/6/06), 942 So.2d 484. The United States Supreme Court disagreed and reversed on the basis the trial court erred in denying a Batson claim. Snyder v. Louisiana, ___ U.S. ___, ___, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008).
In Snyder v. Louisiana, the Supreme Court focused its analysis on only one of the jurors, Mr. Brooks. The prosecutor offered two race-neutral reasons for the peremptory strike of Mr. Brooks: (1) that he appeared very nervous, and (2) he was concerned about a conflicting obligation and might render a lesser verdict to avoid a penalty phase in order to shorten his jury service. Snyder v. Louisiana, supra at 1208. The trial judge allowed the challenge without explanation or comment.
In reviewing the prosecutor's proffered explanations, the Supreme Court rejected the first stated reason on the basis the record failed to show the trial judge made a determination regarding Mr. Brooks' demeanor. The Supreme Court reasoned that it could not presume the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous because the trial judge allowed the peremptory challenge without explanation. Id. at 1209.
The Supreme Court then looked to the second proffered reason and concluded the explanation failed, even under the deferential standard of review. Snyder v. Louisiana, supra at 1209. It noted that any *752 concern Mr. Brooks expressed about missing his student-teaching obligation was dispelled when the school dean was contacted, during voir dire, and indicated there would be no problem if Mr. Brooks missed a few days of student teaching for jury service. The Supreme Court remarked that Mr. Brooks expressed no further concerns about his obligation and the prosecutor chose not to further question Mr. Brooks about the matter. Id. at 1210.
It also determined the prosecutor's claim that Mr. Brooks would be motivated to find the defendant guilty of a lesser offense to obviate the penalty phase was highly speculative. The Supreme Court observed that even if Mr. Brooks favored a quick resolution, it would not have necessarily led him to return a lesser verdict, especially if the majority of jurors initially favored a verdict of guilty as charged. The Supreme Court further found the anticipated and actual brevity of the trial did not support the prosecutor's stated concern. Thus, it concluded the prosecutor's second proffered race-neutral reason for striking Mr. Brooks was suspicious. Snyder v. Louisiana, supra at 1211.
After determining the reason was suspicious, the Supreme Court further evaluated the implausibility of the prosecutor's explanation. It found the implausibility of the stated reason was "reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear[ed] to have been at least as serious as Mr. Brooks'."[14]Id. The Supreme Court observed that the prosecutor further questioned one white juror, who had a conflicting obligation, in an attempt to elicit assurances that he would be able to serve despite his obligations, but declined to further question Mr. Brooks. Snyder v. Louisiana, supra at 1211.
In Snyder v. Louisiana, the Supreme Court recognized the trial judge's great discretion in evaluating discriminatory intent in a Batson challenge. Snyder v. Louisiana, supra at 1208. While it acknowledged the importance of the trial judge's first-hand observations of a juror's demeanor, which often forms the basis for race-neutral reasons for peremptory challenges, the Snyder v. Louisiana Court seemed to suggest that deference should not be given to the trial court's evaluation of discriminatory intent when the record fails to show the trial court made a determination of the prosecutor's credibility and the prospective juror's demeanor. Id. The Snyder v. Louisiana Court ultimately held that a Batson violation occurred. It concluded that the prosecutor's second proffered explanation was implausible and, therefore, gave rise to an inference of discriminatory intent. The Supreme Court also concluded the record did not show the prosecution would have exercised a peremptory challenge to strike Mr. Brooks based on his nervousness alone, the prosecutor's first proffered explanation. Id. at 1212.
Here, the trial judge correctly found that the defendant met his burden under the first step of the Batson analysis to establish a prima facie case of racial discrimination. Under the second step, the burden then shifted to the prosecutor to present a race-neutral explanation for striking Ms. Brown. Batson, 106 S.Ct. at 1723-24. The state argues on appeal that it met its burden in providing race-neutral *753 reasons. The state asserts that Ms. Brown was reticent in her answers. This reticence and her attitude made the prosecutor uncomfortable, thus justifying the strike.
On the transcript and record as it exists before us, the prosecutor mischaracterized Ms. Brown's testimony. The trial judge stated that she thought Ms. Brown volunteered or blurted out her views about police. The prosecutor stated that spontaneous statements concerned him. The current record, however, belies that characterization of Ms. Brown's testimony. Nowhere in the current record did Ms. Brown spontaneously express her views about the police. If Ms. Brown blurted out a response, that would have been contained in the missing portion of the transcript. Rather, on the record before us, she responded to the prosecutor's question asking her how she thought officers did in general before the storm. Under these circumstances, the prosecutor's proffered explanation for striking Ms. Brown appears suspicious.
The prosecutor also stated he struck her because of her demeanor and her act of rolling her eyes. However, the trial judge did not comment on these statements by the prosecutor. Snyder v. Louisiana requires the trial court to assess the credibility of the prosecutor as well as the juror's demeanor in assessing the plausibility of the proffered race-neutral explanation. As discussed above, Snyder v. Louisiana suggests that deference should not be given to the trial court's ruling on the Batson issue when the trial judge fails to make a ruling on the prosecutor's credibility and the prospective juror's demeanor. Under Snyder v. Louisiana's application of Batson, therefore, an appellate court applying Batson arguably should find clear error when the record reflects that the trial court was not able to verify the aspect of the juror's demeanor upon which the prosecutor based his or her peremptory challenge. Haynes v. Quarterman, 526 F.3d 189, 2008 WL 1808457, *9 (5th Cir.2008).
Here the trial judge never commented on the prospective juror's attitude toward the prosecutor, the "rolling" eyes or the demeanor, and (based on the record before us) the judge was incorrect in believing that Ms. Brown blurted out her views. Under the circumstances, the prosecutor's proffered explanation for striking Ms. Brown on these grounds also appears suspicious.
Considering the above proffered reasons, it also appears suspicious that if the prosecutor were concerned about Ms. Brown's views toward police officers, he would have questioned her further about whether, despite those views, she could still be fair. The prosecutor's lack of voir dire examination on an issue that he claimed was of such concern, casts serious doubt on the sincerity and validity of the prosecutor's proffered reason. As noted in Miller-El v. Dretke, 545 U.S. 231, 250, 125 S.Ct. 2317, 2330 n. 8, 162 L.Ed.2d 196 (2005), "the failure to ask undermines the persuasiveness of the claimed concern."[15]
*754 We note that the implausibility of the stated reasons is reinforced by the fact that Ms. Brown had answered affirmatively when defense counsel asked the entire panel whether they would not hold their dislike of a police officer against any other officer but would listen and weigh the information to resolve the matter on the reasonable doubt standard.
The third step of Batson requires the trial judge to assess the plausibility of the prosecutor's proffered reason in light of all evidence bearing on it. Miller-El v. Dretke, supra, 125 S.Ct. at 2331. The prosecutor's proffered explanation for striking Ms. Brown appears implausible in light of the current record. As such, based on the transcript and record as it exists before us, there is an inference of discriminatory intent and the trial court erred in denying defense counsel's Batson challenge as to Ms. Brown.
But, the record is incomplete. Under the Miller-El directive "to assess the plausibility of the prosecutor's proffered reason in light of all evidence bearing on it" we cannot determine whether Ms. Brown did in fact blurt out or spontaneously volunteer her views about the police when the prosecutor questioned the jury panel at the outset.
La.C.Cr.P. art. 843 requires either the clerk or the court reporter to record all proceedings, including the examination of prospective jurors, rulings, objections, and arguments of counsel. This voir dire transcript is deficient and prejudicial to the defendant for purposes of this appeal because it does not contain the entire examination of prospective jurors in Panel 5. The court reporter indicated there was a defective tape during the fifth panel. Apparently, there was no backup procedure in place.
In State v. Pinion, 06-2346 (La.10/26/07), 968 So.2d 131, 134-35 (per curiam) (Citations omitted), the Louisiana Supreme Court explained that "the failure to record bench conferences will ordinarily not affect the direct review process when the record suggests that the unrecorded bench conferences had no discernible impact on the proceedings and did not result in any specific prejudice to the defendant."
As in State v. Landry, 97-499 (La.6/29/99), 751 So.2d 214, 216 this record is grossly incomplete in several respects and the deficient record deprived the defendant of his constitutional right of appeal and judicial review. Landry reaffirmed that "it is not the defendant's obligation to ensure an adequate record ... it is the duty of the court ... to see that the court reporter makes a true, complete and accurate record of the trial." 751 So.2d at 216 citing in part La.C.Cr.P. art. 17.
In Pinion, the Supreme Court found that the omission of bench conferences of the jury challenges, the uncertainty of how many cause challenges the defendant made unsuccessfully, and the absence of other contemporaneous records accounting for the selection process, e.g., adequate minutes or jury strike sheets, require[d] reversal of the defendant's conviction and sentence. 968 So.2d at 136.
It is apparent that the court reporter failed to preserve the venire testimony. It appears in this instance that the court reporter failed to stenographically record the venire testimony relying instead on the backup recording device, which failed. It is incumbent upon the court reporter to ensure the voir dire testimony is *755 transcribed and that the venireperson's voir dire is accurately recorded and transcribed.[16]
We also note that peppered throughout the transcript was the use of the terms "Prospective Male Juror" and "Prospective Female Juror" rather than prospective juror's name or some other designation. While in this case this technique did not contribute to the reversible error, this practice renders it extremely difficult for an appellate court to make an adequate review of the voir dire testimony. In some cases, it could necessitate reversal.[17]
Accordingly, for the reasons stated, we reverse the conviction and sentence and remand for a new trial.

OTHER ASSIGNMENTS/ERROR PATENT
Having found reversible error, we pretermit a discussion of the remaining pro se assignments. We also pretermit discussion of the errors patent review. See: State v. Johnson, 93-1021 (La.App. 5 Cir. 5/11/94), 638 So.2d 273, 275 (error patent review pretermitted).
However, we note the following regarding counsel's assignment of error, since the issue is likely to recur.
Appellate counsel Jane L. Beebe assigned one error arguing that the evidence was illegally seized. Ms. Beebe also represented codefendant Larry Jones a/k/a Larry Cheatteam. In both appeals, Ms. Beebe raised identical issues regarding the assignment. We have previously addressed counsel's assigned error in codefendant's Larry Jones a/k/a Larry Cheatteam's appeal and found the assignment meritless. In State v. Jones, 07-271 (La. App. 5 Cir. 10/30/07), 970 So.2d 1143, 1147-49, we fully addressed this assignment. Thus, we find no merit in counsel's assigned error.

DECREE
For the reasons assigned, the conviction and sentence are reversed and the case is remanded for a new trial in accordance with law.
REVERSED AND REMANDED FOR A NEW TRIAL.
DUFRESNE, J., concurs with reasons.
DUFRESNE, J., concurs.
I find the transcript of the Voir Dire to be incomplete.
NOTES
[1] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[2] This court previously considered the other two defendants' separate appeals: State v. Carter, 07-270 (La.App. 5 Cir. 12/27/07), 976 So.2d 196; State v. Jones, 07-271 (La.App. 5 Cir. 10/30/07), 970 So.2d 1143.
[3] The rule provides:

No case fixed for argument or submission on the calendar may be continued, except in extraordinary situations which the court deems to justify a continuance.
[4] State v. Cheatteam, 07-756 (La.App. 5 Cir. 10/3/07) (unpublished).
[5] La. Const, art. I, §§ 2, 19, and 22 requires courts to accept and consider post-verdict pro se filings from represented defendants. State v. Melon, 95-2209 (La.9/22/95), 660 So.2d 466, 466-67. Accord, State v. Radacker, 98-434 (La.App. 5 Cir. 11/25/98), 722 So.2d 1093, 1094, writ denied, 99-031 (La.4/30/99), 741 So.2d 11 ("In accordance with the directive in [M]elon ... this court will consider the assignments of error addressed by defendant's pro se brief, as well as those addressed by defense counsel."). Moreover, in accordance with Melon, the Supreme Court in State v. Stewart, 99-113 (La.1/29/99), 736 So.2d 820 directed the appellate court to supply the defendant with a copy of the appellate record and to afford him sufficient time to prepare a pro se supplemental brief.
[6] Miller-El v. Dretke, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005).
[7] Snyder v. Louisiana, ___ U.S. ___, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008).
[8] In order to preserve the complaint that the state's use of a peremptory challenge was based solely on race, the defense must make an objection before the entire jury panel is sworn. State v. Williams, 524 So.2d 746, 746 (La. 1988) (per curiam) (relying on Batson).
[9] Mr. Netterville lodged the challenges on behalf of codefendant Mr. Jones. Mr. Doyle, the defendant's counsel, and Mr. Soignet, codefendant Mr. Carter's counsel, joined in the objections.
[10] See discussion, infra.
[11] The Miller-El Court concluded:

More powerful than these bare statistics [state's skewed peremptory strikes of black venirepersons], however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve. If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.
(Citation omitted) 125 S.Ct. at 2325.
[12] The defendant also argues generally that the prosecutor treated non African-Americans differently. He does not specifically refer to Ms. Yyonne Newman. We note, however, that it appears defense counsel correctly referred to disparate treatment in that panel. In Panel 5, the prosecutor accepted Ms. Newman. He had asked her impression of police officers in general and she responded: "I think the majority of them are good. There are a few that are questionable." The prosecutor then asked if she had any bad experience and she said: "Only what I read in the newspapers." It was Corey Cheatteam's counsel who exercised a peremptory challenge to strike her. He noted this was his last challenge. Since defense counsels made no Batson challenge, and the defendant's counsel exhausted his last peremptory challenge, it appears that Ms. Newman was non African-American. However, there is no evidence in the record of that fact. And since the entire voir dire of the fifth panel is missing a discussion with regard to the backstrikes of Ms. Middleton and Ms. Williams, it is unknown whether the racial composition of these individuals was mentioned in the missing portion.
[13] Initially, the Louisiana Supreme Court conditionally affirmed the defendant's conviction and remanded the case for a nunc pro tunc determination of the defendant's competency. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832. On appeal after the remand, the supreme court affirmed the defendant's conviction and sentence. State v. Snyder, 98-1078 (La.4/14/04), 874 So.2d 739. The defendant subsequently applied for a writ of certiorari to the United States Supreme Court. While his writ was pending, the Supreme Court decided Miller-El v. Dretke, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005). The Supreme Court remanded the case to the Louisiana Supreme Court to consider Snyder's case in light of its decision in Miller-El. Snyder v. Louisiana, 545 U.S. 1137, 125 S.Ct. 2956, 162 L.Ed.2d 884 (2005). The Louisiana Supreme Court again rejected the defendant's Batson claim and affirmed his conviction and sentence. State v. Snyder, 98-1078 (La.9/6/06), 942 So.2d 484.
[14] It is noted that the comparison of similarly situated white jurors to the challenged black juror was argued by the defendant for the first time in his brief to the United States Supreme Court and was not an argument presented to the courts below. Snyder v. Louisiana, ___ U.S. ___, ___, 128 S.Ct. 1203, 1214, 170 L.Ed.2d 175 (2008) (Thomas, J. dissenting, joined by Scalia, J.)
[15] The Louisiana Supreme Court has observed:

[A]lthough there is no requirement that a litigant question a prospective juror during voir dire, the jurisprudence holds that the lack of questioning or mere cursory questioning before excluding a juror peremptorily is evidence that the explanation is a sham and a pretext for discrimination. The purpose of voir dire examination is to develop the prospective juror's state of mind not only to enable the trial judge to determine actual bias, but to enable counsel to exercise his intuitive judgment concerning the prospective jurors' possible bias or prejudice.
(Internal citations omitted). Alex v. Rayne Concrete Service, 05-1457 (La. 1/26/07), 951 So.2d 138, 154.
[16] See: La.R.S. 13:10.2(A)(1), which states:

Notwithstanding any other provision of law to the contrary, each court reporter appointed as an official court reporter by any judge of any court shall be required to take an oath of office and to furnish bond for the faithful performance of the duties of the office.
[17] See, for example, State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214, 216, where among other deficiencies in the voir dire transcript, the court noted: "To worsen matters, not only are questions shown as inaudible, but the record indicates that the inaudible responses were made by unidentified jurors."