NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-553

STATE OF LOUISIANA

VERSUS

NORRIS A. PALMS

**********
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 17914-00
HONORABLE ARTHUR J. PLANCHARD, PRESIDING
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Oswald A. Decuir, Judges.

AFFIRMED.

John F. DeRosier, District Attorney
John Coffman, Assistant District Attorney
Carla L. Sigler, Assistant District Attorney
14th Judicial District, Parish of Calcasieu
1020 Ryan Street
Lake Charles, LA 70601
(337) 437-3400
COUNSEL FOR APPELLEE:
    State of Louisiana

W. Jarred Franklin
Louisiana Appellate Project
3001 Old Minden Road
Bossier City, LA 71112
(318) 746-7467
COUNSEL FOR DEFENDANT-APPELLANT:
    Norris A. Palms

**COOKS, Judge.**

Defendant appeals his conviction on four counts of armed robbery. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

Defendant, Norris A. Palms, was charged by bill of information with five counts of armed robbery, violations of La.R.S. 14:64. A written plea of not guilty was entered. The State dismissed count three of the bill of information and a jury trial commenced. Defendant was convicted on March 22, 2002 of the armed robbery of: 1) Guillory's Thrifty Way Pharmacy on June 28, 2000; 2) Insta Cash on July 18, 2000; 3) Derrick's Watch Repair on July 26, 2000; and 4) Thrifty Way Pharmacy on August 8, 2000.[1]

Defendant filed a Motion for New Trial. After a hearing, the motion was denied. Defense counsel then stated she would appeal that decision and the trial court granted an appeal.

On December 17, 2002, Defendant was adjudicated a second felony offender and sentenced to serve forty-nine and one half years in the custody of the Louisiana Department of Corrections on each count, to run concurrently with each other, without benefit of probation, parole, or suspension of sentence.[2]

Defendant filed an application for post-conviction relief on September 27, 2004. The application was denied on December 5, 2007, but an out-of-time appeal was granted. A "Motion for Out of Time Appeal and Designation of Record" was filed on January 8, 2008. The motion was granted on January 15, 2008.

Defendant is now before this court asserting the following six assignments of error:

---

[1] Insta Cash is spelled various ways in the record. We will use the spelling found in the bill of information.

[2] The bill of information charging Defendant as an habitual offender was filed in trial court docket number 02-10907. The trial court docket number currently before this court is 00-17914.

1) there was insufficient evidence to prove his guilt beyond a reasonable doubt;

2) the trial court erred in denying his Motion for Continuance;

3) the State failed to provide and/or timely provide exculpatory and impeaching evidence;

4) defense counsel's performance at trial was deficient;

5) the trial court erred in denying his challenges to the State's exclusion of jurors based upon race; and

6) the sentences imposed are excessive.

Appellate counsel also filed a motion to supplement the record with the habitual offender bill of information. That motion was referred to the merits.

## _____ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, Defendant contends there was insufficient evidence to prove his guilt for the offenses of armed robbery beyond a reasonable doubt.

Defendant does not dispute that the armed robberies at issue occurred. However, he asserts the evidence was insufficient to prove he committed the offenses.

> [W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. *State v. Weary*, 03-3067 (La.4/24/06), 931 So.2d 297; *State v. Neal*, 00-0674 (La.6/29/01), 796 So.2d 649. Positive identification by only one witness is sufficient to support a conviction. *Weary*, 03-3067 at p. 18, 931 So.2d at 311; *Neal*, 00-0674 at p. 11, 796 So.2d at 658; *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988).

*State v. Hughes*, 05-992, pp. 5-6 (La. 11/29/06), 943 So.2d 1047, 1051.

Furthermore, "[i]dentification by a single witness may support a conviction despite considerable alibi testimony. *State in the Interest of Johnson*, 461 So.2d 551 (La.App. 3 Cir.1984); *State v. Brian*, 502 So.2d 293 (La.App. 3 Cir.1987)." *State v. Henry*, 95-428, p. 6 (La.App. 3 Cir. 10/4/95), 663 So.2d 309, 311, *writ denied*, 96-681 (La. 5/16/97), 693 So.2d 793.

Where conflicting testimony exists, calling for a determination of credibility of the witness is a matter of weight of the evidence and not its sufficiency. *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. *State v. Nolan*, 503 So.2d 1186 (La.App. 3 Cir.), *writ denied*, 507 So.2d 226 (La.1987).

*State v. Leger*, 04-1467, p. 19 (La.App. 3 Cir. 6/1/05), 907 So.2d 739, 754, *writ denied*, 05-2263 (La. 4/17/06), 926 So.2d 509, *cert. denied*, __ U.S. __, 127 S.Ct. 245 (2006) (quoting *State v. Duncan*, 93-1384, p. 8 (La.App. 3 Cir. 4/6/94), 635 So.2d 653, 657, *writ denied*, 94-1067 (La.10/28/94), 644 So.2d 649). Such a determination "may not be reviewed on appeal. LSA-Const. Art. V, § 10(B) (1974)." *State v. Taylor*, 94-1072, p. 6 (La.App. 3 Cir. 3/8/95), 651 So.2d 955, 959. We will address individually each armed robbery conviction.

Guillory's Thrifty Way Pharmacy - June 28, 2000

Laurie Broussard was working at Guillory's Thrifty Way Pharmacy on June 28, 2000. That day, a man entered the store and asked about Pepto-Bismol, to which Broussard began to respond. The next thing she knew, the man was behind the counter, with his arm around her, and a gun to her head. The man dragged Broussard into the back office where her boss, Farrell Guillory, was sitting at a desk. The assailant demanded all the big bills. Broussard gave him two hundred fifty dollars ($250.00) and Guillory gave him the money in his pocket. The assailant then put Guillory in the bathroom and brought Broussard back to the front of the store, where he demanded money from the register. Broussard eventually opened the register and gave him the money inside. He then put Broussard in the bathroom and told her and Guillory that someone was watching the building and would kill them if they came out.

After the assailant left, a lady entered the store. Broussard and Guillory heard the lady and came out from the bathroom. Guillory then called the police. Guillory corroborated Broussard's version of the events that took place that day.

-2-

Broussard was not presented with a photographic line-up and never viewed a physical line-up. However, she made an in-court identification of Defendant as the man who robbed the store. At trial, she was asked if she described the man as having gold teeth, a goatee, or facial hair to police and she indicated she did not. Broussard further testified she did not see any tattoos on the robber and did not see any tattoos that Defendant had while she was in court.

Guillory was presented with a photographic line-up from which he identified Defendant. Guillory also made an in-court identification of Defendant as the man who robbed the store. Guillory did not recall if he told police the man had a goatee or gold teeth.

Jeanette Joubert, the customer who entered the pharmacy as the assailant was leaving, saw him putting money in his pocket and a revolver. She never viewed a photographic lineup. However, she made an in-court identification of Defendant as the man she saw leaving the pharmacy. She testified she described the man to police as clean shaven. Additionally, she testified she did not recall seeing any tattoos on the man and was not asked by police if she saw any tattoos or scars.

Insta Cash - July 18, 2000

Deanna Vittorio worked at Insta Cash on July 18, 2000. At approximately 5:30 p.m., a man came to the front door of the business, which was always locked, and she instructed him to use the back door. Vittorio did not immediately let the man in, but did inform him what was required for a loan. The man then asked if he would be getting cash right away. Vittorio responded and the man grabbed her arm, forced his way into the building, pulled out a gun, and asked her to show him where the money was located. Vittorio gave him the money and he took her to the back of the office, put her behind a screen, and told her not to move. He then disassembled the phones and told her someone would be watching her. Vittorio subsequently pushed the panic button and called her employer.

Police arrived and she described the assailant as a black man, twenty-five to thirty-five years old, who wore black jeans, a black and tan shirt, and a baseball cap. She further indicated he had short, "kinda curly" hair and one or two gold teeth. She also told police the man did not have facial hair. Vittorio was presented with a photographic line-up on August 10, 2000, from which she identified Defendant as the man who robbed Insta Cash. Vittorio also made an in-court identification of Defendant.

Detective Steve Rathjen, who responded to the robbery at Insta Cash, testified the clerk described the assailant as five foot eight inches tall with a slim build. A photographic line-up was presented to the clerk and she identified Defendant. On cross-examination, Detective Rathjen was questioned regarding the photographic line-up as follows:

Q    Can you tell me, if you read the reports today, what description did Ms. Vittorio give you of the suspect?

A    I believe five, nine, 150, slim build, Black male.

Q    Did she tell you he was clean shaven?

A    I believe she said that might have had, you know, specks --

Q    You want to see her statement? Would that refresh your memory?

A    And had a Jamaican accent and two gold teeth.

Q    Do you recall her telling you she didn't remember any facial hair?

A    What's that?

Q    You recall her telling you that she did not remember any facial hair?

A    No.

Q    May I show you the report?

A    Go ahead.

. . . .

-4-

Q   Did you type up this statement that Ms. Vittorio signed?

A   Yes, ma'am. Yeah, she says, "I don't remember any facial hair."

Q   Okay.

A   "And large brown eyes."

Q   We don't remember any facial hair.

A   Okay.

Q   I show you again what Mr. Coffman presented to you just a second ago. And ask you how many of the other five do not have facial hair, excluding Mr. Palms?

A   All five.

Q   All five have --

A   He appears to have a moustache and a little goatee in the photo.

Q   Do you know when this photograph was taken?

A   August. The photo of him?

Q   Yes.

A   Would have been his book-in date, which I believe was August 9th. You'd have to ask Officer Vincent -- Vince.

Q   Do you remember when this composite was made?

A   August 10th.

Q   I show you again all six photographs there. To the best of your knowledge, being a man, which of the six look like they have a 5:00 o'clock shadow, or they just haven't shaved in a day or two.

A   Like they haven't shaved in a day or two?

Q   Yes.

A   I guess number 5.

Q   Number 5 would be --

A   Norris Palms.

Q   -- Norris Palms. Thank you.

Detective Rathjen testified when he interviewed Defendant, he did not have any gold teeth. However, Detective Rathjen testified this did not concern him because gold caps could be purchased and put over the teeth. Detective Rathjen was also not concerned that Defendant did not have a Jamaican accent.

Derrick's Watch Repair - July 26, 2000

Theresa DeRouen worked at Derrick's Watch Repair on July 26, 2000. Between 11:30 a.m. and 12:00 p.m., she waited on a customer, who subsequently left the store. A young man then walked in and DeRouen bent down to finish work created by the previous customer. DeRouen testified the next thing she knew, the man was behind the counter right next to her with a gun demanding money. DeRouen gave the assailant money and he wanted larger bills. She then took him to the vault and gave him all the cash that was in the store.

Once the assailant got the money, he pushed DeRouen and Derrick Cooper into a back room and closed the door. The assailant then attempted to disconnect the phones and left the store. Cooper confirmed that the store was robbed.

DeRouen went to the police department and gave a statement that day. On August 9, 2000, she was presented with a photographic line-up from which she identified Defendant as the person who robbed the store. She also made an in-court identification.

Cooper never saw the assailant's face and did not identify him. However, he described the man as approximately six foot tall, weighing one hundred forty pounds, with short hair, and dark skin who wore black pants and a black t-shirt. Cooper testified he did not know if the man had facial hair.

Thrifty Way Pharmacy - August 8, 2000

Constance Chapman was employed at Thrifty Way Pharmacy on August 8, 2000. On that day, a man came into the store and asked for the manager. Chapman turned to the manager and, when she turned back around, the assailant was beside her

with a gun. The assailant then spoke with the manager. He subsequently brought Chapman and two other girls into the office where he held a gun to the head of Shanna Prejean and directed her to open the safe.

Prejean testified that Chapman turned to tell her a man needed assistance and the assailant stepped into the pharmacy area behind her and pulled a gun. The man then shoved Chapman and put the gun to Prejean's head and took her into the office to get money for him. The assailant subsequently brought her to the cash drawer to retrieve money, which she did.

Kimberly Bilbo also worked at Thrifty Way. She corroborated the testimony of Chapman and Prejean. Lisa Simon, who was also employed at Thrifty Way, testified that on the date of the incident, she was walking out of the store when a man entered the store. As she walked back into the store, another employee pushed her out of the store, said the store was being robbed, and told her to call 911. As she called 911, a man ran out of the store. She described him as skinny and clean shaven.

On August 9, 2000, Chapman was shown a photographic line-up. She identified Defendant as the man who robbed the store. Chapman also made an in-court identification.

The day following the robbery, Prejean was shown a photographic line-up. She selected Defendant from that line-up. Prejean also made an in-court identification of Defendant. Prejean testified she did not recall whether the man had facial hair. However, he did not have gold teeth or tattoos.

At trial, Bilbo described the man as a tall, very skinny, black male who wore a baseball cap, a black t-shirt, and black jeans. She further stated he was "pretty clean shaven, he had like a light goatee." She also stated he was approximately six foot two inches tall. In the statement Bilbo gave on August 9, 2000, she said the man may have had a slight goatee. Bilbo also informed police she thought the man might be in his mid-twenties. Bilbo was presented with a photographic line-up on August 9,

2000, from which she identified Defendant as the person who robbed the store. Bilbo also made an in-court identification.

Simon was presented with a photographic line-up on August 9, 2000, from which she selected Defendant as the person who robbed the store. Simon also made an in-court identification of Defendant.

Janet Powell was picking up a prescription on the date in question. She was speaking to employees of the store when she saw a man holding a gun to the head of the pharmacist. Shortly after the robbery, Powell told police she believed the assailant was between eighteen and twenty years old, did not have facial hair, and she saw no tattoos or scars.

About a week later, police brought photographs to her home. Powell testified she was having problems identifying the man who robbed the store and the officer asked if she needed help. She indicated she did and the officer then pointed to an individual and stated "everyone that I've asked [has] picked him there." Powell testified she then looked at the photograph and said, "Oh my God, it is him." Powell then selected Defendant from the line-up. Powell testified she was one hundred percent certain Defendant was the man who robbed the store and she made an in-court identification of Defendant.

Paul Vince, a former police officer, testified he responded to an armed robbery at Thrifty Way Pharmacy on August 8, 2000. Upon his arrival at the scene, he determined a black male entered the store and robbed it. Vince testified that during other robberies composites of a suspect were made. He left Thrifty Way, retrieved the composites, returned to the store, and showed the composites to the witnesses who "identified it as possibly the same person."

Later, police received a tip regarding Defendant, and Vince requested a photographic line-up which would include Defendant's picture. Vince testified that Powell was presented with a photographic lineup and narrowed it down to two

suspects. Vince further testified he then informed her to go through the characteristics she knew and she then selected the Defendant and said, "I'm pretty certain that's him." Vince responded, "Well, that's who everybody else is picking." Powell later reported Vince's behavior to the officer in charge of the Detective's division. Vince was subsequently asked if he helped Powell with the photographic line-up and he indicated that he had not.

At trial, Defendant denied committing any of the robberies at issue. He testified he was five-foot ten inches tall and weighed one hundred forty pounds. He further testified he had several tattoos, including two on his neck, and one on each forearm and bicep. The Defendant claimed the two tattoos on his neck had been there for at least five years and it had been two years since he had gotten any tattoos. Defendant further testified he had a scar on his nose.

In brief to this court, Defendant asserts the State failed to negate the possibility of misidentification, as no fingerprint, DNA, or physical evidence linked him to the crimes. Defendant further asserts the only evidentiary link between himself and the crimes was witness identification of him as the robber. Defendant contends those identifications were contrary to each other and tainted by improper police procedures; thus, they were unreliable and insufficient to sustain the convictions.

Defendant asserts the photographic line-up presented to witnesses was tainted by improper police procedures. Defendant notes that upon her initial review of the line-up, Janet Powell could not identify him, but narrowed her choices to Defendant and one other person. Defendant asserts that it was only after Vince pointed out the Defendant that Powell made a positive identification. Defendant contends this procedure was not proper and Vince had been disciplined in the past for utilizing this technique.

Defendant further argues he is five feet ten inches tall and weighs one hundred and forty pounds. He contends his most distinguishing features are the tattoos he has

on his neck, back, chest, stomach, and both arms. He argues some of his tattoos would have been visible at the time of the offenses at issue. However, no witness described the robber as having tattoos nor did they testify at trial that the robber had tattoos. Defendant then points out that one witness described the robber as having gold teeth while others denied seeing any gold teeth. Additionally, one said he had a goatee and others said he was clean-shaven.

Defendant further asserts that the type of robberies he was charged with continued to occur after he was arrested and incarcerated. He contends Lakeshore Pharmacy was robbed by an individual driving a late 80's model Ford Taurus similar to the vehicle witnesses described as being present at the Thrifty Way Pharmacy. Further, Detective Vince arrested Quinton McKenzie who had robbed a Conoco station. Defendant argues McKenzie matches the description of the robber in the offenses at issue, as he was six foot tall, had a slim build, and was twenty to thirty years old. Defendant also asserts there was an unsolved robbery of individuals in the Hobby Lobby parking lot which was similar in nature to the instant offenses.

In summary, Defendant asserts the State failed to negate the reasonable possibility of misidentification based on the inconsistencies in the descriptions of the robber, the tainted identification by Powell, the continuation of robberies after his arrest and incarceration, and the similarities between the Defendant and Quinton McKenzie. Lastly, he argues the State failed to follow up on physical evidence that could have cleared him.

Although there was no physical evidence linking the Defendant to the four armed robberies at issue, multiple individuals present at each location identified the Defendant as the robber, both in photographic lineups and with in court identifications. The only identification that may have been tainted by improper police procedure was the identification made by Powell, who was at Thrifty Way Pharmacy. However, four other persons present at that location identified Defendant as the

robber.

Defendant wanted the jury to believe that he had tattoos on his neck at the time of the offenses and those tattoos were visible at those times. However, none of the witnesses testified regarding whether the perpetrator's neck was visible at the time of the offenses. Furthermore, none of the witnesses testified that the Defendant had tattoos and Broussard, who was employed at Guillory's Thrifty Way Pharmacy, testified that she could not see the Defendant's tattoos at trial.

The jury heard Deanna Vittorio's testimony that the perpetrator had one or two gold teeth. However, Detective Rathjen testified that removable gold caps can be placed on the teeth. Additionally, the only witness who testified about the perpetrator possibly having a goatee was Bilbo, who stated the perpetrator was "pretty clean shaven, he had like a light goatee."

Defendant argues the type of robberies at issue continued after he was arrested. He points out the Lakeshore Pharmacy was robbed after his arrest and a car matching the vehicle the Thrifty Way Pharmacy robbery was present at that robbery. Information regarding the Lakeshore Pharmacy and a car resembling that present at the Thrifty Way Pharmacy robbery was presented at the hearing on the Defendant's motion for new trial, but was not heard by the jury. Defendant has not asked this court to review the trial court's denial of his motion for new trial. Thus, the information he now directs our attention to does not form part of the trial record for purposes of reviewing the sufficiency of the evidence to support the jury's verdicts.

Defendant further asserts Detective Vince arrested Quinton McKenzie who robbed a Conoco station and he matched the description of the robber in the cases at bar.[3] Defendant also points out that McKenzie was six foot tall, had a slim build, and was twenty to thirty years old. Defendant further asserts there was a robbery in the

___

[3]In brief to this court, the Defendant refers to Quinton McKenzie. In the record, the same person is referred to as Quinton Mckenzie Williams.

parking lot of Hobby Lobby that was similar to the cases at bar.

At trial, Detective Vince was questioned about the robbery at Hobby Lobby and Quinton Mckenzie Williams as follows:

Q     Do you recall in March of 2000, investigating a robbery where a description was a black male, 20 to 30 years old, 6 foot tall, slim build, on Highway 14 in -- I want to say it was Hobby Lobby parking lot?

A     I don't -- I don't remember if your description is right. I remember that there were two ladies from Jennings getting into a vehicle, Black male approached. Jumped in the back, kidnapped them. Took them down Highway 14 and released them out of a vehicle at the Carpet Max or something like that down south of Prien Lake Road.

Q     Did you solve that robbery?

A     No.

Q     It's still unsolved?

A     Correct.

Q     Do you know who Quentin Mckenzie Williams is? Do you recall -- does that name ring a bell?

A     It rings a bell. I couldn't -- I couldn't identify him if he walked in. It rings a bell from just being in law enforcement.

Q     You couldn't identify him for me? You couldn't give me his height and his weight?

A     No, ma'am.

Q     Do you remember arresting him for armed robbery?

A     If you told me the case I might could tell you if I remember. The name is very familiar. I couldn't tell you what I've arrested him for. He's been arrested several times.

Q     Robbed a Conoco store -- what do you mean tell you the case?

A     Ma'am?

Q     What he did?

A     If you would tell me which case I investigated I could tell you if I arrested him or not. I'm -- I know that he's been arrested several times. I've arrested a lot of people in 20 years. I couldn't tell you everybody I've arrested.

-12-

Q      This would have been in 2000.  He robbed a Conoco store at Lakeshore and Pujo.

A      Yes.  I -- he -- I think there was a -- three or four armed robberies that I arrested him for.  His arrest came -- 30 minutes after he pulled the armed robbery I located him in a hotel room.

Q      He did the three or four back to back?

A      I think it was over two or three days.  The weapon was recovered, the money was recovered.  He -- I believe he even gave a confession on them.

Although there was testimony that Detective Vince influenced the decision in one photographic line-up, the jury heard witnesses from each robbery identify the Defendant as the perpetrator of each of the offenses.  Identification by one witness is sufficient to support a conviction.  The jury's verdicts indicate the jury chose to believe the testimony of the many witnesses who identified the Defendant and chose to disregard the Defendant's claims of innocence.  Those credibility determinations should not be second guessed by this court.  Based on the evidence presented and the jury's verdicts, we find the State negated any possibility of misidentification by the conduct of Detective Vince.  Accordingly, this assignment of error lacks merit.

#### ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, Defendant contends the trial court erred in denying his Motion for Continuance.

> La.C.Cr.P. art. 707 requires that a defendant file a written motion for a continuance at least seven days prior to trial, specifically alleging the grounds on which it is based and verified by the affidavit of the defendant or his counsel.  Upon written motion and after a contradictory hearing, the court may grant a continuance, but only on a showing that such motion is in the interest of justice. . . .
>
> An oral motion for a continuance is permitted when the occurrences that allegedly made a continuance necessary rose unexpectedly. *State v. Campbell*, 99-0892 (La.App. 4 Cir. 1/3/01), 778 So.2d 636.

*State v. Dangerfield*, 00-2359, p. 7 (La.App. 4 Cir. 4/3/02), 816 So.2d 885, 893, *writ denied*, 02-1269 (La. 11/22/02), 829 So.2d 1038.

-13-

The trial court has great discretion in deciding whether to grant a continuance, and its ruling will not be overturned absent an abuse of discretion. *State v. Bourque*, 622 So.2d 198 (La.1993); *State v. Champion*, 412 So.2d 1048 (La.1982); La.C.Cr.P. art. 712. Further, we generally will not reverse a conviction due to an improper ruling on a continuance unless there is a showing of specific prejudice to the defendant as a result of the denial of the continuance. *State v. Strickland*, 94-0025 (La.11/1/96), 683 So.2d 218; *State v. Knighton*, 436 So.2d 1141 (La.1983).

*State v. Castleberry*, 98-1388, p. 11 (La. 4/13/99), 758 So.2d 749, 759-60, *cert. denied*, 528 U.S. 893, 120 S.Ct. 220 (1999).

At a hearing held on March 18, 2002 (a Monday), defense counsel informed the trial court that she received supplemental discovery on Friday, although she had spoken to the prosecutor and was expecting it. Defense counsel further informed the trial court that she had been taking care of her mother-in-law who was terminally ill. She received a call on Thursday night that her mother-in-law was dying; thus, she was out of town all weekend. Defense counsel then asserted that she did not look at the additional discovery provided by the State until the morning of the hearing. She then asked for a continuance. She further indicated she had spoken to an investigator who informed her that the work he needed to do could not be done over the weekend. Additionally, her office did not receive the discovery until Friday evening.

The State informed the trial court that it had disclosed to the defense a witness alleged a detective indicated which person she should select from a photographic line-up and it did not find out about the discovery until "last week." The State further informed the trial court that upon finding out the information, it contacted other witnesses, who denied this activity had occurred. The State then urged that it was possible to entertain a motion to suppress before trial on objecting to defendant's motion for continuance. In response, defense counsel asserted she had been taking care of her mother-in-law since January 19, and she would like to have her own investigator speak to the witnesses. Defense counsel further asserted she had missed a considerable amount of time "during the week" and, regardless of the supplemental

-14-

discovery, she was not prepared to go forward with Defendant's trial.

The trial court questioned defense counsel, who indicated she had Defendant's case for eighteen months. The trial court then informed defense counsel that, in light of the time she had been handling the case, she had time to prepare. The trial court further stated that the additional discovery information would not prohibit the case from going forward. The trial court then denied the motion to continue and set a hearing on the motion to suppress for the next day.

We find Defendant failed to present proof of any prejudice suffered as a result of the trial court's denial of the motion to continue. Defense counsel asserted she had inadequate time to prepare for trial. She noted she had been out of the office caring for her sick mother-in-law. However, on April 27, 2001, and June 4, 2001, the matter was fixed for trial on October 22, 2001. On October 22, 2001, the matter was reset for December 10, 2001. Finally, on December 14, 2001, the matter was reset for March 18, 2002. Thus, we find defense counsel had adequate time to prepare and the time to prepare in this case was not so minimal as to call into question the basic fairness of the proceedings.

Moreover, Defendant cannot prove prejudice regarding the disclosure of Powell's statement that her decision regarding identification was influenced by a police, as the day following the denial of the motion to continue, a hearing on a motion to suppress was held wherein witnesses were called and questioned about the photographic line-up and procedure used by police.

For these reasons, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, Defendant contends the State failed to timely provide exculpatory and impeachment evidence to him. Specifically, Defendant asserts the State failed to timely deliver a report indicating Detective Vince had engaged in improper tactics with regard to a photographic line-up he conducted.

Defendant further argues this information led to a great deal of other information regarding Detective Vince's tactics, disciplinary history, and subsequent arrest for taking part in a burglary ring. In making this argument, Defendant asks this court to rely on the arguments made in his application for post-conviction relief and adopts those arguments by reference.

Defendant also asserts it was well established the State had information regarding the tainted photographic line-up at least eighteen months prior to trial, but only produced it on the Friday before trial commenced on Monday. Additionally, exculpatory information was discovered post-trial after a "Motion for Issuance of a Subpoena Duces Tecum or in the Alternative, Public Records Act Request" was filed. Defendant avers that this resulted in Detective Vince's Internal Affairs file being released, which revealed numerous offenses, violations of law and department policy, and ultimately an arrest for participation in a burglary ring.

In *State v. Dozier*, 97-1564, p. 6 (La.App. 3 Cir. 5/20/98), 713 So.2d 729, 733, *writ denied*, 98-1694 (La. 11/25/98), 729 So.2d 573, this court stated: "'[a] tardy disclosure of evidence during trial is not a true *Brady* case.' *State v. Corley*, 617 So.2d 1292, 1302 (La.App. 3 Cir.), *reversed on other grounds*, 93-1934 (La.3/11/94); 633 So.2d 151, *rehearing denied*, *certiorari denied*, 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994)." The issue regarding Powell's photographic line-up involves the timeliness of disclosure of the evidence and not the failure to disclose. Defense counsel was made aware of the existence of this information the Thursday before trial, at the latest. She was allowed to question witnesses about the photographic line-ups at a motion to suppress hearing held on Tuesday, March 19, 2002. At trial, defense counsel questioned Detective Vince about his role in Powell's identification of Defendant and proffered testimony regarding the report, investigation, and outcome of an internal affairs investigation into Vince's behavior during the presentation of that photographic line-up. Thus, Defendant has failed to

-16-

prove he was prejudiced by the late disclosure of the information regarding the procedure used during Powell's identification of the Defendant in a photographic line-up.

As far as information received by counsel for Defendant after trial, appellate counsel attempts to adopt arguments made in Defendant's application for post-conviction relief and two memorandums in support thereof. The arguments contained in the application and memorandum were not asserted in brief to this court and will not be considered by this court on appeal. Uniform Rules—Courts of Appeal, Rule 1-3. Thus, we cannot consider Defendant's claims regarding the post-trial disclosure of evidence contained in Detective Vince's internal affairs record.

Defendant may re-urge these claims in a new application for post-conviction relief timely filed in the trial court, as the trial court's ruling on his previous application for post-conviction relief was a nullity because the trial court was divested of jurisdiction when the present appeal was granted on December 5, 2002. Therefore, the trial court lacked authority to rule on the previous application for post-conviction relief filed on September 27, 2004. *See State v. Francis*, 597 So.2d 55, 60 (La.App. 1 Cir. 1992).

**_____ASSIGNMENT OF ERROR NO. 4**

In his fourth assignment of error, Defendant contends defense counsel's performance at trial was deficient and rendered the verdict unreliable.

In *State v. Leger*, 05-11, p. 44 (La. 7/10/06), 936 So.2d 108, 142-43, *cert. denied*, __ U.S. __, 127 S.Ct. 1279 (2007), the supreme court discussed ineffective assistance of counsel claims as follows:

> "Initially we note that ineffective assistance of counsel claims are usually addressed in post-conviction proceedings, rather than on direct appeal." *State v. Deruise*, 1998-0541 p. 35 (La.4/3/01), 802 So.2d 1224, 1247-1248, *cert. denied*, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001). The post-conviction proceeding allows the trial court to conduct a full evidentiary hearing, if one is warranted. *State v. Howard*, 1998-0064 p. 15 (La.4/23/99), 751 So.2d 783, 802, *cert. denied*, 528

U.S. 974, 120 S.Ct. 420, 145 L.Ed.2d 328 (1999). Where the record, however, contains evidence sufficient to decide the issue, and the issue is raised on appeal by an assignment of error, the issue may be considered in the interest of judicial economy. *State v. Smith*, 1998-1417 (La.6/29/01), 793 So.2d 1199 (Appendix, p. 10), *cert. denied*, 535 U.S. 937, 122 S.Ct. 1317, 152 L.Ed.2d 226 (2002); *State v. Ratcliff*, 416 So.2d 528 (La.1982).

Under the standard for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this court in *State v. Washington*, 491 So.2d 1337, 1339 (La.1986), a reviewing court must reverse a conviction if the defendant establishes: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect.

Defendant asserts defense counsel was ineffective. He relies on affidavits attached to an application for post-conviction relief and asserts after trial, defense counsel was arrested for seven counts of fraud and identity theft and transferred to disability inactive status. He also asserts most of defense counsel's ineffective assistance was the result of *Brady* violations by the State coupled with the denial of her request for a continuance. Defendant further asserts defense counsel failed to adequately investigate the tainted identification and failed to issue subpoenas for Detective Vince's internal affairs records. Additionally, defense counsel failed to file a motion to reconsider sentence and a notice of appeal. Defendant notes an application for post-conviction relief was filed and asks that those arguments be adopted and incorporated by reference into his brief to this court.

As set forth earlier, the only witness to testify that Detective Vince influenced her selection during the presentation of a photographic line-up was Powell, who was present during the robbery at Thrifty Way Pharmacy. Other witnesses present at the pharmacy, Prejean, Bilbo, and Simon, testified that Detective Vince presented them with the photographic line-up, but did not influence their selection of Defendant. Chapman, who was also present at the pharmacy, indicated Detective Vince presented her with the photographic line-up but she was not asked if he influenced her selection.

We are not convinced the jurors' verdict on the Thrifty Way Pharmacy charge would have been different had Powell's testimony been suppressed.

We also note that Guillory, who was present at Guillory's Thrifty Way Pharmacy, was shown a photographic line-up by Detective Vince, testified that his selection was not influenced. DeRouen, who was present at Derrick's Watch Repair, was presented a photographic line-up by Detective Vince and another police officer, and she was not asked if her selection was influenced. Therefore, Defendant did not establish that Vince's alleged improper acts during the photographic line-up presented to Powell influenced the jurors' verdicts on the other counts of armed robbery.

Defendant also asserts defense counsel was ineffective for failing to file a motion for appeal and a motion to reconsider sentence. A review of the record indicates defense counsel orally requested and was granted an appeal at the close of the hearing on the motion for new trial. Thus, Defendant cannot prove defense counsel was ineffective for failing to file a written motion for appeal. We also find the assertion that defense counsel was ineffective for failing to file a motion to reconsider sentence cannot be considered by this court. The motion to reconsider sentence would have had to be filed in trial court docket number 10907-02, the docket number in which Defendant was sentenced, and that docket number is not before this court for review. For these reasons, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 5**

In his fifth assignment of error, Defendant contends the trial court erred in denying his challenges to the State's exclusion of jurors based upon race.

The fifth circuit recently discussed the state of the law regarding *Batson* challenges in *State v. Cheatteam*, 07-272, pp. 4-5 (La.App. 5 Cir. 5/27/08), 986 So.2d 738, 743-44, as follows:

The Equal Protection Clause of the United States Constitution

-19-

prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson,* the United States Supreme Court established a three-step analysis to be applied when addressing a claim that peremptory challenges of a prospective juror were based on race. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. *Batson*, 106 S.Ct. at 1723. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. *Batson*, 106 S.Ct. at 1723-24. This second step "does not demand an explanation that is persuasive or even plausible," as long as the reason is not inherently discriminatory, it suffices. *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam). Third, the court must then determine whether the defendant has established purposeful discrimination. *Batson*, 106 S.Ct. at 1724. It is at this third step that implausible explanations offered by the prosecution "may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 115 S.Ct. at 1771. "[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, ---U.S. ----, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008), *citing Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991).

The Supreme Court later affirmed and applied the three-part test in *Miller-El v. Dretke*, 545 U.S. 231, 239, 125 S.Ct. 2317, 2324, 162 L.Ed.2d 196 (2005), and, most recently, in *Snyder v. Louisiana*, *supra*. In *Miller-El*, the Supreme Court emphasized the trial judge's responsibility to assess the plausibility of the prosecutor's proffered race-neutral reason "in light of all evidence with a bearing on it." *Miller-El*, 125 S.Ct. at 2331. The Supreme Court further stated:

> A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Miller-El*, 125 S.Ct. at 2332.

In its most recent case, *Snyder v. Louisiana*, *supra,* the Supreme Court again emphasized that the plausibility of the prosecutor's explanation for a peremptory strike is to be carefully scrutinized by the trial judge under the third step of the *Batson* inquiry and noted that implausible reasons will fail a *Batson* challenge. In discussing the third step of the *Batson* inquiry in *Snyder*, the Supreme Court stressed the trial judge's pivotal role in determining the plausibility of the state's race-neutral explanation. The Supreme Court explained that the third step requires the trial court to evaluate the prosecutor's credibility by assessing "not only whether the prosecutor's demeanor belies a

discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v. Louisiana*, ---U.S. ----, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008).

Referencing its earlier decision in *Miller-El*, the Supreme Court again stressed that "all of the circumstances that bear upon the issue of racial animosity must be consulted" in determining whether the explanation given for the strike is convincingly race-neutral. *Snyder v. Louisiana*, *supra* at 1208. When the record does not support the prosecutor's proffered explanation or shows the proffered explanation to be implausible, there is an inference of discriminatory intent that sufficiently demonstrates a *Batson* violation. *Id.* at 1212.

Defendant asserts the State did not give plausible race-neutral reasons for the exclusion of potential jurors Hudson and Clark. During jury selection, the State attempted to peremptorily strike Hudson. Defense counsel made a *Batson* objection. The trial court asked for the State's reasons for the peremptory strike and the State indicated the character of witness Detective Paul Vince would be at issue during trial and Hudson knew Vince. The trial court concluded the reason given by the State was race-neutral and denied the *Batson* challenge.

The State also attempted to peremptorily strike Clark. At that time, defense counsel made a *Batson* challenge. The State asserted it was challenging Clark because of her criminal history. The trial court concluded that the reason given by the State was race-neutral and denied the *Batson* challenge.

"Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *State v. Coleman*, 06-518, p. 4 (La. 11/2/07), 970 So.2d 511, 514 (quoting *State v. Green*, 94-887 (La.5/22/95), 655 So.2d 272). The State gave reasons for its use of peremptory challenges. "The neutral explanation must be one which is clear, reasonably specific, legitimate, and related to the particular case at bar." *State v. Collier*, 553 So.2d 815, 820 (La.1989).

In *State v. Matthews*, 26,550 (La.App. 2 Cir. 12/21/94), 649 So.2d 1022, *writ denied*, 95-435 (La. 6/1/95), 655 So.2d 341, the second circuit concluded the State provided adequate racially neutral reasons for exercising its peremptory challenge to a potential juror rather than question him as to who he would believe if the witnesses he knew were to present conflicting testimony, since this questioning could have tainted the entire jury pool. In *State v. Heard*, 40,284, p. 9 (La.App. 2 Cir. 12/14/05), 917 So.2d 658, 665, *writ denied*, 06-188 (La. 6/16/06), 929 So.2d 1285, *writ denied*, 06-781 (La. 10/6/06), 938 So.2d 71, the second circuit stated that "[p]rior criminal history has long been considered a valid reason to peremptorily excuse a prospective juror."

Based on the transcript of *voir dire* and the cases cited herein, the State's reason for excluding Hudson was race-neutral, as he knew one of the witnesses who would testify at trial and that witness's credibility would be at issue. The State's reason for excluding Clark was also race-neutral, as she had a prior criminal conviction.

**ASSIGNMENT OF ERROR NO. 6**

In his sixth assignment of error, Defendant contends the sentences imposed were excessive for this offender and these offenses. Defendant was tried and convicted in trial court docket number 17914-00. An appeal was granted at the close of the hearing on Defendant's motion for new trial, which was filed in trial court docket number 17914-00. Defendant had not been sentenced at that time. Defendant was subsequently adjudicated an habitual offender in trial court docket number 10907-02 and was sentenced accordingly.

Defendant filed an application for post-conviction relief in trial court docket number 17914-00. At the close of the hearing regarding that application, the trial court granted an out-of-time appeal without specifying the docket number in which the appeal was granted. Defense counsel then filed a "Motion for Out of Time

Appeal and Designation of Record" bearing trial court docket number 17914-00.

The jurisdiction of the trial court is divested and that of the appellate court attaches upon the entering of the order of appeal. La.Code Crim.P. art. 916. Thus, jurisdiction of this court has only attached to the proceedings in trial court docket number 17914-00. Because jurisdiction in trial court docket number 10907-02 is still vested in the trial court, and because all sentencing issues were handled under that docket number, we have no jurisdiction to consider those issues. *State v. Perkins*, 07-423, p. 9 (La.App. 3 Cir. 10/31/07), 968 So.2d 1178, 1184, *writ denied*, 07-2408 (La. 5/9/08), 980 So.2d 688. Accordingly, this assignment of error cannot be considered.

## REQUEST TO SUPPLEMENT THE RECORD

On June 5, 2008, this court received a motion from appellate counsel wherein he requested that the appellate record be supplemented with the habitual offender bill of information and the transcript of the jury verdicts. On June 17, 2008, this court issued an order requiring the court reporter to transcribe the portion of trial that contained the jury's verdicts and deliver that transcript to this court in a supplemental record. The request to supplement the record with the habitual offender bill was referred to the merits.

Based on our analysis in assignment of error number six, appellate counsel's request to supplement the appellate record with the habitual offender bill of is denied.

## DECREE

For the foregoing reasons, Defendant's convictions are affirmed.

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.**