STATE OF LOUISIANA

VERSUS

TOBE LAWRENCE JR.

NO. 21-KA-733

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 18-6790, DIVISION "G"
HONORABLE E. ADRIAN ADAMS, JUDGE PRESIDING

November 02, 2022

**HANS J. LILJEBERG**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Hans J. Liljeberg, and John J. Molaison, Jr.

**AFFIRMED; REMANDED WITH INSTRUCTIONS**
    **HJL**
    **SMC**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Alexis Barteet
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
      Honorable Paul D. Connick, Jr.
      Thomas J. Butler
      Monique D. Nolan
      Lindsay L. Truhe
      Zachary L. Grate

COUNSEL FOR DEFENDANT/APPELLANT,
TOBE LAWRENCE, JR.
      Bertha M. Hillman

**LILJEBERG, J.**

Defendant appeals his conviction and sentence for aggravated rape of a victim under twelve years old. For the following reasons, we affirm. We also remand for correction of errors patent.

## PROCEDURAL HISTORY

On February 14, 2019, a Jefferson Parish Grand Jury returned an indictment charging defendant, Tobe Lawrence Jr., with "First Degree Rape (known prior to August 1, 2015 as Aggravated Rape)," on or between August 1, 2001, and December 31, 2005, wherein the victim was under the age of thirteen, in violation of La. R.S. 14:42. Defendant pleaded not guilty. On June 1, 2021, the indictment was amended to change the date range of the offense to "on or between August 15, 2001 and May 17, 2008," and to allege that the victim was under the age of twelve.

Trial began on June 1, 2021. At the conclusion of trial on June 3, 2021, the jury unanimously found defendant guilty of aggravated rape of a victim under twelve. On June 30, 2021, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Defendant appeals.

## FACTS

In July of 2018, K.A., who was 22 years old at the time, reported to the Kenner Police Department that she had been sexually abused as a juvenile by defendant, Tobe Lawrence, who was the ex-boyfriend of her grandmother, Monica Collar.[1] At trial, Detective Peter Foltz testified that he was assigned to conduct a follow-up investigation and met with K.A. who gave an audio-recorded statement. In her statement, K.A. described four incidents of sexual abuse by defendant.

---

[1] In the interest of protecting minor crime victims and victims of sexual offenses as set forth in La. R.S. 46:1844(W)(3), this Court has adopted a policy that its published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity. *See State v. E.J.M., III*, 12-774 (La. App. 5 Cir. 5/23/13), 119 So.3d 648, n.1.

21-KA-733     1

According to Detective Foltz, K.A. stated that the first incident occurred when she was four or five years old and had come home from school. K.A. lived with her grandmother, defendant, and others at the time. She recalled that defendant joined her on the sofa to watch television, and she was looking for a remote when she "found" defendant's penis in her hand. Defendant told her it was something she had to learn how to use later. K.A. told the detective that defendant began fondling her vagina and had her perform oral sex on him.

Detective Foltz testified that K.A. told him about a second incident when defendant called her into a room at her grandmother's house when she was six or seven years old. Defendant placed K.A. on his lap facing towards him and gave her instructions. Defendant then grabbed her around the waist and "began running her vaginal area against his penile area." K.A. told the detective that defendant inserted his finger into her vagina, which caused her to scream. She stated that her cousin, T.C., came in the room, but defendant told him to leave. K.A. informed Detective Foltz that she was then forced to perform oral sex on defendant.

Detective Foltz testified about a third incident described by K.A. that occurred when she was approximately seven years old. K.A. told him that she and T.C. were sleeping on a pallet when defendant woke her up.[2] She stated that defendant began performing oral sex on her. The detective testified that K.A. said defendant placed her on top of his penile area and neither of them had on underwear, so her vaginal area rubbed against his groin. K.A. stated that she believes defendant stopped when he heard her aunt arrive home. Detective Foltz testified that K.A. said she followed T.C. into a bathroom that same day and "tried to hump" him and attempted to perform oral sex on him. T.C.'s mother, T., walked in and made them stop. Detective Foltz testified that he also questioned

---

[2] K.A. described a pallet as a bunch of blankets and pillows on the ground.

T.C. about this incident, and T.C. advised that they touched each other's private parts that day. However, T.C. was not able to provide any further information.

The detective stated that K.A. recalled a fourth incident when she was in second or third grade and approximately nine years old. K.A. told Detective Foltz that she and defendant were lying on a bed together, and he began fondling her vagina and digitally penetrated her. K.A. recalled that defendant then inserted his penis into her vagina. She cried from the pain, so defendant stopped. She continued to cry, so defendant told her to tell her grandmother that she "caught a whooping." The detective recalled that K.A. said her grandmother gave her Pepto-Bismol later that night after she complained that her stomach hurt. Detective Foltz provided that K.A. indicated there were ten or more incidents when she was sexually assaulted by defendant.

Detective Foltz testified that he later spoke with K.A.'s aunt, L.C., because Ms. Collor advised him that L.C. said defendant also sexually abused her. According to Detective Foltz, L.C. stated that she was around ten years old when defendant started to sexually abuse her. L.C. told the detective about three specific incidents. The first incident occurred when L.C. was working out at home, and defendant approached her and began massaging her. During the massage, he touched her chest area under her shirt. L.C. described a second incident to Detective Foltz when she and defendant were lying in a bed together. Defendant "began touching her on the chest area and then at which time he got on top of her in a mounting position and began to dry-hump her." L.C. pushed defendant to the side, and then he began touching her chest and vaginal area under her clothes. L.C. recalled a third incident when she was a juvenile and was in a vehicle with defendant. L.C. told the detective that defendant placed her on his lap, "acting like she was driving," and began touching her vaginal area.

21-KA-733                                      3

Based on the information he received, Detective Foltz obtained two arrests warrants—one based on K.A.'s allegations and the other on L.C.'s allegations.

K.A.'s trial testimony was consistent with the information she provided to Detective Foltz. K.A. testified that defendant was "a grandfather" in her family. K.A. indicated that she had lived at defendant's house on Albany Street, and could clearly recall several sexually inappropriate incidents involving defendant. She testified that the first incident occurred when she was four or five years old and had been dropped off at home after kindergarten. K.A. recalled that she and defendant were sitting on the sofa watching television when she reached for the remote and "ended up feeling" defendant's penis. She asked defendant what it was, and he told her she would to have to use it one day. Defendant then explained what to do, and she performed oral sex on him.

K.A. testified about a second incident at her grandmother's house on Albany Street, which was "up the street" from defendant's house on Albany where the first incident occurred, when she was in first or second grade. She recalled that she was in a room with her cousin, T.C., and a friend, when defendant called her into another room. She stated that defendant placed her on top of him and was moving her hips back and forth towards his hips. K.A. testified that defendant then flipped her over and "that was the first time he asked to insert his fingers." K.A. screamed, and T.C. came into the room. Defendant told him to go back. T.C. thought she was "getting a whooping," and K.A. said she thought it was "a whooping" at the time. K.A. testified that defendant told her not to tell anyone, that she was his princess, and called her "Tweety Bird."

K.A. testified about a third incident that occurred on Albany Street at the same house as the first incident. She stated that she and T.C. were lying on a pallet when defendant laid by her and performed oral sex on her. K.A. believed defendant stopped when he heard her aunt's car. Sometime later that day, K.A.

went to the bathroom where T.C. was and started to do the same actions with T.C. that she had done with defendant. K.A. stated that her aunt came in and noticed they were "humping" and that she was about to perform oral sex on T.C., so she and T.C. "caught a whooping."[3] K.A. later asked defendant why T.C. did not like it since defendant did, and he told her not to do it with anyone else.

K.A. testified about a fourth incident that occurred at a house on Gadsden Street, where they lived at the time, while her grandmother was at the store. K.A. was watching television when defendant came in the room, kissed her, took off both of their bottoms, and "actually inserted his self [sic] inside of" her. K.A. recalled that it was the first time he had done this and it hurt, so she screamed and started crying. K.A. testified that defendant stopped. When her grandmother came home, K.A. was still crying, so defendant said K.A. "caught a whooping because she was jumping from the sofa to the table or from the table to the sofa." K.A. recalled that her stomach was hurting that night, so her grandmother gave her Pepto-Bismol and she drank the entire bottle. K.A. testified that this incident occurred when she was about in the third grade and was about nine years old. She stated that this fourth incident was different than the others because previously, defendant would go slow and try to get her comfortable, but he did not ease her into it this time. K.A. explained that she remembered these four incidents vividly, but there were over ten times that he told her to perform oral sex, fondled her vagina, or "did other things of that nature."

K.A. testified that when she was a child, she did not tell anyone about the abuse. She later opened up to her ex-girlfriend, Amber Davis, who was the first person she told about the abuse. K.A. recalled that after she told Ms. Davis about

---

[3] T., K.A.'s aunt, testified that she and her family, including her son T.C., lived with defendant at one point. T. recalled an incident between K.A. and T.C. when they were younger than five years old. She stated they were in a bathroom together and being inappropriate with each other, so she yelled at them.

the abuse, there was a Father's Day event in 2018 when defendant came to her father's house. K.A. testified that defendant was making eye contact with her, and Ms. Davis asked her what was wrong and if "that's him." When K.A. said yes, Ms. Davis told her to say something or she would tell K.A.'s dad.

Amber Davis testified that K.A. is her ex-girlfriend. She indicated that while they were dating, K.A. told her that she used to go to her "uncle's house," and he would sexually abuse her. She stated that K.A. told her "it started from oral to penetration." Ms. Davis said K.A. did not tell her the person's name and only said "it was somebody that she was related to." Ms. Davis recalled attending a barbecue around Father's Day in June of 2018. She stated she was in the pool with K.A. and others when K.A.'s mood changed as her father walked up with her "uncle." Ms. Davis asked if she was okay, and K.A. replied, "that's the person who did it to me." Ms. Davis testified that she asked K.A. why she did not say anything, and K.A. replied that she did not know how her dad would react.

L.C. testified that defendant was her stepfather, and K.A. is her niece. She indicated that defendant started sexually abusing her when she was about ten years old. She remembered an incident when she was sore from playing sports, and defendant massaged her but also touched her breasts. L.C. also recalled an incident when she was lying in bed with defendant "and it went from touching to dry humping." She further testified about an incident when she was still a child and defendant was teaching her how to drive. Defendant sat her on his lap and touched her chest area and legs. L.C. testified that she eventually told her sister what happened to her because something similar happened to K.A.

Monica Collor, K.A.'s grandmother, testified that she met defendant over twenty years ago and was his girlfriend, but they broke up in 2006. She stated that defendant and several others lived with her on Albany Street and Gadsden Street. Defendant would sometimes watch the children when she was not home. Ms.

Collor remembered an incident when she came home, and K.A. was crying. Ms. Collor asked defendant why K.A. was crying, and he said she was being disrespectful so he "whooped her." She testified that she never knew K.A. to be disrespectful to an adult. She recalled that K.A. was in kindergarten or first grade at that time. Ms. Collor also stated that she had previously heard defendant make inappropriate comments about younger females.

At trial, T.C. testified that K.A., his cousin, was two or three years older than him. He stated that they lived together growing up and were raised by their grandmother. He recalled an occasion when he heard K.A. scream and went to check on her. He stated that he went to defendant's room and defendant told him to leave, but he did not see anyone else. T.C. also recalled him and K.A. "touching each other" in a bathroom and his "aunt" walking in. He stated that he recalled the event because they "got a whooping for it."

A.A. testified that K.A., his daughter, was four or five years old when he separated from K.A.'s mother, and K.A. then lived with her mom, her grandmother, and defendant. A.A. recalled a Father's Day event in 2018 when defendant came to pick him up and went to see the girls in the pool, including K.A. A.A. testified that K.A. called him a few weeks later and said she wanted to talk. After A.A. spoke with K.A., he spoke to defendant about what K.A. told him, and he denied the allegations. A.A. testified that he and others had previously heard defendant and another man make comments that they would "like to mess with young girls and young women, stuff like that – teenagers." He specifically recalled that defendant said "[t]hey had sex with a little teenager. She was like seventeen, eighteen, you know, sixteen years old."

Dr. Neha Mehta, an expert in child abuse pediatrics, testified that it is common for a child victim to delay disclosing abuse and that the vast majority of children do not tell in a timely manner. Dr. Mehta acknowledged that a familial

relationship between the abuser and the victim can affect whether the abuse is reported and the timeliness of the disclosure. She testified that a younger victim may re-enact the sexual behavior they experienced.

## LAW AND DISCUSSION

On appeal, defendant sets forth one counseled assignment of error and two *pro se* assignments of error. In his first *pro se* assignment of error, defendant asserts that the State failed to meet its burden of proving beyond a reasonable doubt that he was guilty of aggravated rape of a victim under twelve years old. [4] He argues that all of the evidence was either impeached or contradicted and the State failed to present any corroborating evidence. He asserts that K.A.'s memories could be false, noting that many years elapsed between the alleged incidents and their reporting. Defendant asserts that the State called T.C. to corroborate one of K.A.'s allegations, but T.C. did not corroborate that K.A. was in the room with defendant. Defendant concluded that a reasonable jury would have found that the State failed to meet its burden of proof.

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, *writ denied*, 21-274 (La. 4/27/21), 314 So.3d 838, *cert. denied*, -- U.S. --, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021). In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *State v. Lane*,

---

[4] When the issues on appeal relate to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. *See State v. Hearold*, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. *Id.*

20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804. The credibility of a witness, including the victim, is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *Id.*; *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1233.

In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 703. In sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *Id.*; *State v. Raye*, 17-136 (La. App. 5 Cir. 10/25/17), 230 So.3d 659, 666, *writ denied*, 17-1966 (La. 6/15/18), 257 So.3d 674.

In the present case, defendant was found guilty by a jury of aggravated rape of a victim under 12.[5] At the time of the offenses, La. R.S. 14:42(A)(4)[6] defined aggravated rape as follows:

> A. Aggravated rape is a rape committed ... where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
> ...
> (4) When the victim is under the age of twelve years. Lack of knowledge of the victim's age shall not be a defense.

La. R.S. 14:41(A) defines rape as "the act of anal, oral, or vaginal sexual intercourse with a male or female person committed without the person's lawful consent." La. R.S. 14:41(B) provides that "Emission is not necessary, and any

---

[5] La. R.S. 14:42(E) states in part, "Any act in violation of the provisions of this Section committed on or after August 1, 2015, shall be referred to as "first degree rape." It is noted that the incidents at issue occurred prior to August 1, 2015.

[6] La. R.S. 14:42 was amended during the time range alleged in the indictment. The statutory amendment raised the age from twelve years old to thirteen years old. The indictment provides that the victim was born on May 18, 1996, and the record shows that she was under twelve when all allegations of sexual abuse occurred.

sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime." La. R.S. 14:41(C) provides:

> For purposes of this Subpart, "oral sexual intercourse" means the intentional engaging in any of the following acts with another person:
> (1) The touching of the anus or genitals of the victim by the offender using the mouth or tongue of the offender.
> (2) The touching of the anus or genitals of the offender by the victim using the mouth or tongue of the victim.

On appeal, defendant does not argue that the State failed to prove any specific, statutory element of the crime for which he was convicted. Rather, he challenges his conviction on the basis that all of the evidence was contradicted or impeached.

The record shows that the State presented sufficient evidence to support defendant's conviction. At trial, K.A. testified as to four specific incidents but also indicated that defendant either told her to perform oral sex, fondled her vagina, or "did other things of that nature" more than ten times. The first incident she remembered occurred when she was four or five years old. K.A. recalled that she was reaching for the remote and "ended up feeling" defendant's penis. K.A. testified that during that incident, she performed oral sex on defendant. K.A. testified about a second incident that occurred when she was in first or second grade. She described that she was on top of defendant, and he was moving her hips back and forth towards his hips. K.A. stated that defendant then flipped her over and put his fingers inside of her for the first time. K.A. testified about a third incident wherein defendant performed oral sex on her. Finally, K.A. remembered a fourth incident when she was in third grade. She stated that defendant took off both of their bottoms and "actually inserted his self [sic] inside of" her.

Defendant argues that K.A.'s testimony was contradicted by T.C., who testified that he heard a scream but then did not see K.A. in the room with defendant. However, the fact that T.C. did not see her does not necessarily

contradict K.A.'s testimony that she was there. Defendant provides no other support for his claim that the evidence presented by the State was impeached or contradicted.

After considering the testimony and evidence presented at trial, the jury had to make credibility determinations and apparently found K.A.'s testimony to be credible. This Court should not second guess credibility determinations. *See Chinchilla*, 307 So.3d at 1197; *State v. Simon*, 10-1111 (La. App. 3 Cir. 4/13/11), 62 So.3d 318, 323, *writ denied*, 11-1008 (La. 11/4/11), 75 So.3d 922. Considering the testimony and evidence, along with the applicable law, we conclude that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that the State proved all of the elements of aggravated rape of a victim under twelve beyond a reasonable doubt. This assignment of error is without merit.

In his sole counseled assignment of error, defendant argues that the trial court erred in ruling that the State's use of peremptory challenges did not violate *Batson*.[7] He provides that after twelve jurors were selected but before an alternate was chosen, the State used a backstrike to eliminate Devin Demesme, a black male on the first panel. Defendant notes that the State previously used only two peremptory challenges, both against black males, Heath Davillier on the first panel and Juvan Smith on the second panel. He argues that he raised a *Batson* challenge, noting that all of the State's peremptory challenges had been used to eliminate black males, and that the race-neutral reasons given by the State for excusing the jurors were a pretext for excusing them because they were black.

The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination on the basis of race in the exercise of peremptory challenges. U.S. Const. Amend. 14; *State v. Chester*, 19-363 (La. App. 5 Cir.

---

[7] *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2/3/21), 314 So.3d 914, 978, *writ denied*, 21-350 (La. 6/8/21), 317 So.3d 321. In *Batson*, *supra*, the United States Supreme Court held that an equal protection violation occurs when a party uses a peremptory challenge to exclude a prospective juror on the basis of race. *Id.* The *Batson* decision is codified in La. C.Cr.P. art. 795(C), which provides that no peremptory challenge made by the State or the defendant shall be based solely upon the race or gender of the juror. *State v. Massey*, 11-357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 467, *writ denied*, 12-991 (La. 9/21/12), 98 So.3d 332.

The court in *Batson* outlined a three-step test for determining whether a peremptory challenge was based on race. *State v. Cheatteam*, 07-272 (La. App. 5 Cir. 5/27/08), 986 So.2d 738, 743. Under *Batson*, the defendant challenging the peremptory strike must first establish a *prima facie* case of purposeful discrimination. *State v. Victor*, 11-45 (La. App. 5 Cir. 11/15/11), 82 So.3d 301, 311. Second, if a *prima facie* showing is made, the burden shifts to the State to articulate a race-neutral explanation for the challenge. *Id.*; *State v. Sparks*, 88-17 (La. 5/11/11), 68 So.3d 435, 468, *cert. denied*, 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012). This second step "does not demand an explanation that is persuasive or even plausible," as long as the reason is not inherently discriminatory. *Cheatteam*, 986 So.2d at 743; *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. Third, the trial court then must determine if the defendant has carried his ultimate burden of proving purposeful discrimination. *Id.*; *State v. Daniels*, 18-307 (La. App. 5 Cir. 6/11/19), 275 So.3d 380, 392. The ultimate burden of persuasion as to racial motivation in exercising a peremptory challenge rests with, and never shifts from, the opponent of the challenge. *Id.*

Whether there has been intentional racial discrimination is a question of fact. *State v. Edwards*, 06-643 (La. App. 5 Cir. 3/27/07), 957 So.2d 185, 194, *writ denied*, 08-1988 (La. 8/29/08), 989 So.2d 110. A trial judge's findings on a claim of purposeful discrimination are entitled to great deference by the reviewing court because they depend largely on credibility evaluations. *Massey*, 91 So.3d at 469; *State v. Florant*, 12-736 (La. App. 5 Cir. 5/23/13), 119 So.3d 635, 642, *writ denied*, 13-1451 (La. 1/10/14), 130 So.3d 319. The trial judge has the advantage of observing the characteristics and demeanor of the attorneys and prospective jurors. *State v. Wilson*, 09-170 (La. App. 5 Cir. 11/10/09), 28 So.3d 394, 405, *writ denied*, 09-2699 (La. 6/4/10), 38 So.3d 299. Therefore, the court occupies the best position for deciding whether a discriminatory objective underlies the peremptory challenges. *Id.* "[A] trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008), (citing *Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991)).

The record reflects that the State exercised four peremptory challenges during voir dire. On the first panel, the State used a peremptory challenge on Heath Davillier. On the second panel, the State used a peremptory challenge on Juvan Smith. Once twelve jurors were selected but prior to selecting the alternates, the State informed the court that it wanted to exercise a backstrike on Devin Demesme. Defense counsel stated, "I'm starting to see kind of a racial thing here. Every black man except one I think has been – you know." The trial judge informed counsel that he needed to make a *Batson* challenge if he wanted to challenge it. Defense counsel replied, "Yes. That's my challenge. It's also my challenge to Juvan Smith."

After the State asserted that defense counsel needed to first make a *prima facie* case of discrimination, counsel noted that a black male was on trial, and that he is entitled to a jury of his peers. He asserted that his *prima facie* case was that the prosecutor was striking every black male. When the trial judge asked how many black persons had been stricken so far, the prosecutor conceded that he used all three of his peremptory challenges on black males. The trial judge acknowledged the *Batson* challenge and found that the defense put on a *prima facie* showing of purposeful discrimination.

In response, the prosecutor asserted that race was not a basis for his decisions. The prosecutor contended that as to Mr. Davillier,

> when he came up, he said he wasn't really able to read and write and he was coming through Special Ed in high school. Even though the Court did not agree that was a cause challenge, the State would prefer to have someone who could read and write on the jury.

Defense counsel replied that the potential juror graduated high school, has a driver's license, and is a warehouse manager. The trial judge stated:

> The Court finds in reference to this case -- I do recall Mr. Davillier indicating that he has difficulties with reading. We discussed whether or not he graduated from high school. He was a supervisor. He manages -- I think he mentioned one employee, but he said that he struggles with reading and writing. So the Court does not find that State had any exploitation of Mr. Davillier.

The State next addressed its challenge of Mr. Smith. The prosecutor averred that the challenge was "based on Mr. Smith's demeanor and his participation in the process," and was not race-based. The prosecutor stated that Mr. Smith's head was down and his hand was over his face during most of his questions. The prosecutor alleged that Mr. Smith did not appear to be attentive, looked like he was asleep, and that he had to repeat a question to Mr. Smith when it was directed to him. The trial judge found "that the State refuted and has prepondered [sic] neutral reasons for the exclusion for Mr. Smith for the fact that he was non-attentive or not paying attention."

The prosecutor next addressed his backstrike of Mr. Demesme. The prosecutor stated that it was striking Mr. Demesme because he was young and single with no children. The prosecutor provided that for those same reasons, he intended to backstrike another potential juror, Chelsea Everett. Defense counsel argued that this was not a valid reason, because the potential juror was of age to serve on a jury and many people without children serve on juries. The trial judge stated that defense counsel established a *prima facie* showing by the exclusion of three African Americans, but the State "rebutted and assigned a race neutral reason for the exclusions." The State then exercised a backstrike on Ms. Everett as its fourth peremptory challenge.

*Potential Juror Heath Davillier*

Defendant contends that excusing Mr. Davillier because he had limited reading ability was a pretext for excusing him because he was black. He notes that the prosecutor knew that the State's only written evidence was the curriculum vitae of Dr. Mehta and two arrest warrants, both of which were reviewed through testimony and had little bearing on the outcome of the case.

During voir dire, after the trial court read the juror qualifications, Mr. Davillier indicated that he did not meet the qualifications and a bench conference was held. Mr. Davillier told the court that he could not "read and write too well" and stated that he completed the twelfth grade "with Special Ed." Mr. Davillier informed the court that he works for Jefferson Parish Parks and Recreation and supervises another employee. When asked if he could read the newspaper, Mr. Davillier stated, "Some of it. Not that well." Mr. Davillier stated there was no test to get his job as a supervisor and he did not have to read anything to employees.

Outside of Mr. Davillier's presence, the trial judge asked if the State or defense had an issue with Mr. Davillier being excused for cause "as he does not qualify because he does not understand how to read." The State indicated that it

had no objection and suggested a follow-up question as to whether Mr. Davillier had a driver's license. Defense counsel argued that Mr. Davillier should not be stricken for cause, because there would not be a lot of reading in this case and Mr. Davillier had graduated from high school. The trial court asked Mr. Davillier if he had a driver's license, and he indicated that he did. The trial court then stated that Mr. Davillier indicated he has a problem, but it did not find that Mr. Davillier was "unable to understand the English language, to speak or to write" and did not excuse him at that time.

La. C.Cr.P. art. 401 provides the general qualifications of jurors. One such qualification is that the person must be able to read, write, and speak the English language and be possessed of sufficient knowledge of the English language. In *State v. Lindsey*, 543 So.2d 886 (La. 1989), *cert. denied*, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990), the Louisiana Supreme Court recognized the limited education of a juror as a race-neutral basis for exercising a peremptory challenge.

The record reflects that the State offered a race-neutral reason for the challenge of Mr. Davillier, i.e., his difficulty reading. Prior to the State using a peremptory challenge, the trial judge considered excusing Mr. Davillier for cause based on his limited ability to read. The trial court considered Mr. Davillier's responses during voir dire and accepted the State's reason for exercising a peremptory challenge. After review, we find no error in the trial court's finding that defendant failed to carry his burden of proving purposeful discrimination.

*Potential Juror Juvan Smith*

Defendant contends that based on the totality of Mr. Smith's responses to questions and the fact that the State used all three of its peremptory challenges on black jurors, it was error for the court to allow the State to exercise a peremptory challenge on Mr. Smith. Defendant acknowledges that on one occasion, Mr.

Smith failed to raise his hand when the State asked for a show of hands to a question, but he asserts Mr. Smith promptly answered the question when the State repeated it clearly. The State responds that it used a peremptory challenge to excuse Mr. Smith due to his inattentive demeanor, which is a race-neutral reason supported by the record.

The State points to the following exchange to demonstrate Mr. Smith's inattentiveness.

| | |
|---|---|
| **Prosecutor:** | Does everybody agree with Mr. Reasons, except for Mr. Reilly?<br>Show of hands, everybody agrees? |
| | (Jurors Indicating.) |
| **Prosecutor:** | It's the defendant's absolute right not to testify and you will not hold it against him?<br>All right. Mr. Smith, I didn't see a nod. I didn't see a hand. So I've got to ask you. |
| **Mr. Smith:** | Oh, no. I don't have no problem. |
| **Prosecutor:** | Okay. So you will not hold it against the defendant if he doesn't take the stand? |
| **Mr. Smith:** | uh-uh. |

After defendant raised the *Batson* challenge, the prosecutor said he looked at Mr. Smith the whole time and that Mr. Smith's head was down and his hand was over his face during most of his questions. The prosecutor alleged that Mr. Smith did not appear to be attentive during his questions and that he had to repeat a question to Mr. Smith when it was directed to him. The prosecutor also stated that Mr. Smith looked like he was asleep. The trial judge accepted this basis.

Inattentiveness has been found to be an acceptable demeanor-based, race-neutral explanation. *See e.g. State v. Johnson*, 621 So.2d 1167 (La. App. 2 Cir. 1993), *writ denied*, 626 So.2d 1178 (La. 1993); *State v. Young*, 613 So.2d 631 (La. App. 1 Cir. 1992), *writ denied*, 626 So.2d 1186 (La. 1993); *State v. Manuel*, 517 So.2d 374 (La. App. 5 Cir. 1987); *State v. Griffin*, 618 So.2d 680 (La. App. 2 Cir.

1993), *writ denied*, 625 So.2d 1063 (La. 1993). A challenge based on body language is stronger if an attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated. *State v. Tilley*, 99-569 (La. 7/6/00), 767 So.2d 6, 18, *cert. denied*, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d, 375 (2001). When accepted by the trial judge, the exercise of a peremptory challenge based upon a prospective juror's body language does not violate *Batson. State v. Parker*, 04-1017 (La. App. 5 Cir. 3/29/05), 901 So.2d 513, 523, *writ denied*, 05-1451 (La. 1/13/06), 920 So.2d 235. *See also State v. Coleman*, 06-518 (La. 11/2/07), 970 So.2d 511, 515.

In *State v. Davis*, 48,161 (La. App. 2 Cir. 8/7/13), 121 So.3d 1207, *writ denied*, 13-2145 (La. 3/14/14), 134 So.3d 1194, the court found that the State and trial court's concern about a prospective juror's inattentiveness and sleeping were reasons that were not inherently discriminatory and sufficed as race-neutral reasons for the peremptory challenge.

In the present case, the trial court had the advantage of observing the characteristics and demeanor of the attorneys and prospective jurors. The trial court found that the State's explanation for striking Mr. Smith was race-neutral and that defendant had not shown purposeful discrimination. After review, we find no error in the trial court's ruling.

*Potential Juror Devin Demesme*

The record reflects that the State offered a race-neutral reason for the challenge of Mr. Demesme, i.e., that he was young and single with no children.

Early in voir dire, the following exchange occurred:

**The Court:** Devin Demesme.

**Juror No. 136:** No children, not married. I work at the zoo. And I have never been in jury duty. This is my first time.

**The Court:** And you look so young, so you are over 18; right?

**Juror No. 136:** Yeah.

**The Court:** Just want to make sure. All right, sir.

Defendant argues on appeal that the State's challenge of Mr. Demesme was discriminatory, because it accepted a similarly situated white male, Mr. Martinez. However, defendant did not raise this comparison at the trial court level. In *Snyder v. Louisiana*, 552 U.S. at 483, 128 S.Ct. at 1211, the United States Supreme Court cautioned that a reviewing court's retrospective comparison of jurors may be misleading, when the alleged similarities were not raised at trial, since if the alleged similarities had been raised at trial they might have shown that the jurors were not truly comparable. The record reflects that Mr. Martinez stated he was single, had no children, and worked in construction. Although defendant refers to Mr. Martinez as a "similarly situated white male," the record does not reflect his age or race.

Defendant acknowledges that the State used a backstrike on a young, single, white female with no children, Ms. Everett, after it provided its reason for excusing Mr. Demesme. Ms. Everett provided that she was not married, had no children, and worked as a medical scribe. While the record does not reflect Ms. Everett's exact age, the prosecutor described her as a "young, single white female with no kids" when addressing defendant's *Batson* challenge. The record reflects that there were several other, single jurors with no children who were excused, though their ages and races are not reflected in the record.

A juror's age has been found to be an acceptable race-neutral reason for the State to exercise a peremptory challenge. *See State v. Perrilloux*, 03-917 (La. App. 5 Cir. 12/30/03), 864 So.2d 843, 850, *writ denied*, 04-418 (La. 6/25/04), 876 So.2d 830. In the instant case, we find that defendant failed to meet his burden of proving that the State used purposeful discrimination when exercising a peremptory challenge on Mr. Demesme.

In conclusion, we find that the trial court did not err in denying defendant's *Batson* challenge with regard to Mr. Davillier, Mr. Smith, or Mr. Demesme. Accordingly, this assignment of error lacks merit.

In his second *pro se* assignment of error, defendant argues that he was denied his right to a fair and impartial trial when the trial court allowed the State to amend the indictment prior to trial. He notes that on the day of trial, defense counsel was told that the amendment was to correct a clerical error, so he did not initially object. After counsel reviewed the correction, he objected to the State adding two and a half years to the date range for the allegations. Defendant further argues that the amendment was invalid, because the charged offense had to be instituted by indictment and the State failed to bring the amended indictment back to the grand jury. He contends that the amended indictment constitutes a defect of substance and was prejudicial because he was forced to go to trial without full knowledge of the accusations against him.

At the time of the offenses, La. R.S. 14:42(D)(1) stated that whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. C.Cr.P. art. 382 states that prosecution for an offense punishable by life imprisonment shall be instituted by grand jury indictment. Because defendant faced a sentence of life imprisonment, the charge had to be instituted by a grand jury indictment, and it was. However, the indictment did not need to go before the grand jury to be amended. In accordance with La. C.Cr.P. art. 487, after the initiation of prosecution, at any time prior to trial, the district attorney has complete authority to amend indictments, both as to form and substance. *State v. Brazell*, 17-32 (La. App. 4 Cir. 4/18/18), 245 So.3d 15, 29, *writ denied*, 18-868 (La. 3/6/19), 266 So.3d 900, *cert. denied*, -- U.S. --, 140 S.Ct. 263, 205 L.Ed.2d 167

(2019); *State v. Reel*, 10-1737 (La. App. 4 Cir. 10/3/12), 126 So.3d 506, 514, *writ denied*, 12-2433 (La. 4/12/13), 111 So.3d 1018.

Defendant contends that he was prejudiced in his defense on the merits by the amendment adding additional time within which the alleged acts occurred.

La. C.Cr.P. art. 468 provides that the date or time of the commission of the offense need not be alleged in the indictment, unless the date or the time is essential to the offense. The date of the offense is not an essential element of the crime of aggravated rape. *State v. Tillery*, 14-429 (La. App. 5 Cir. 12/16/14), 167 So.3d 15, 21, *writ denied*, 15-106 (La. 11/6/15), 180 So.3d 306; *State v. Brockel*, 98-1089 (La. App. 5 Cir. 3/30/99), 733 So.2d 640, *writ denied*, 99-1516 (La. 10/15/99), 748 So.2d 469; *State v. Cleveland*, 25,628, 630 So.2d 1365, 1368 (La. App. 2 Cir. 1/19/94); *State v. Frith*, 436 So.2d 623 (La. App. 3 Cir. 1983), *writ denied*, 440 So.2d 731 (La. 1983). Hence, if the date or time is not essential to the offense, a mistake respecting the date on which the offense occurred is only a defect of form, which may be corrected at any time with leave of court. *Brockel*, 733 So.2d at 647-648.

"In determining whether the defendant has been prejudiced in his defense upon the merits, the court shall consider all the circumstances of the case and the entire course of the prosecution." La. C.Cr.P. art. 489. The defendant has the burden of establishing that an amendment has prejudiced his defense. *Cleveland*, 630 So.2d at 1368. The mere allegation by the defendant that the defense will be affected by the amendment of the indictment does not constitute a showing of prejudice so as to render a trial court's refusal of a continuance reversible error. *Id.* at 1369; *State v. Johnson*, 95-1002 (La. App. 3 Cir. 3/6/96), 670 So.2d 651, 657.

In the instant case, the indictment originally charged defendant with aggravated rape on or between August 1, 2001 and December 31, 2005, in violation of La. R.S. 14:42, wherein the victim was under the age of thirteen. On

June 1, 2021, before the start of trial, the State indicated that it was amending the indictment with "[j]ust a clerical amendment to the Bill of Indictment, changing the date range as communicated to [defense counsel.]" After an off-the-record discussion and recess, the prosecutor again stated that it had communicated to the court and defense counsel the week prior that the State "has made or is making a clerical amendment to the Bill of Information amending the date range of the offense." The prosecutor specified that it was changing the range to on or between August 15, 2001 and May 17, 2008. The prosecutor provided that the current statute reads that the victim must be under thirteen, but at the beginning of the date range of the offense, the victim had to be under twelve. The prosecutor then amended the indictment to reflect the age of the victim was under twelve.

Defendant objected to the amendments, arguing that the change was "beyond just clerical" and added "two and a half years to the range of the crimes, which is a sixty percent increase." Defendant requested a continuance of the matter, which was denied.

Defendant now asserts that he was prejudiced by the amendment, because he did not know the exact time frame in which the accusations allegedly occurred. However, the record does not show that defendant was surprised by the amendment, and he has not provided specific support as to how the amendment prejudiced him. At the time of the amendment, the prosecutor indicated that he informed defense counsel and the court of the amendment during the prior week. Additionally, as previously noted, the date of the offense is not an essential element of the aggravated rape charge.

Based on the date range in the original indictment, the alleged offense occurred when the victim was between the ages of five and nine. After the amendment, the alleged offense occurred when the victim was between the age of five and the day before her twelfth birthday. Based on the testimony, the abuse

began when K.A was four or five years old and the last specific incident that she testified about occurred when she was in third grade and was approximately nine years old. Defendant has not shown how he was prejudiced by the amendment.[8]

Accordingly, we find that the trial court did not err in allowing the State to amend the indictment. This assignment of error lacks merit.

## ERRORS PATENT

The record was reviewed for errors patent, according to La. C.Cr.P. art. 920; *State v. Oliveaux*, 312 So.2d 337 (La. 1975); and *State v. Weiland*, 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reveals two errors requiring corrective action.

First, the trial court failed to inform defendant of the sex offender registration requirements in accordance with La. R.S. 15:540, *et seq*. Defendant's conviction of aggravated rape in violation of La. R.S. 14:42 is defined as a sex offense under La. R.S. 15:541(24). La. R.S. 15:542 outlines the mandatory registration requirements for sex offenders. La. R.S. 15:543(A) requires the trial court to notify a defendant charged with a sex offense in writing of the registration requirements of La. R.S. 15:542.

Failure to provide this notification, even where a life sentence has been imposed, is an error patent warranting remand for written notification. *State v. Anthony*, 17-372 (La. App. 5 Cir. 12/30/20), 309 So.3d 912, 930, *writ denied*, 21-176 (La. 10/12/21), 325 So.3d 1067. Therefore, we remand to the trial court with instructions to inform defendant of the registration requirements for sex offenders by sending him written notice and to file written proof in the record that defendant received such notice. *See State v. Starr*, 08-341 (La. App. 5 Cir. 11/25/08), 2 So.3d 451, 460-61, *writ denied*, 08-2991 (La. 9/18/09), 17 So.3d 384.

---

[8] We also note that La. R.S. 14:42(D)(2) provided that if the victim was under the age of twelve and the district attorney does not seek a capital verdict, as in the instant case, the offender faces the same penalty as if the victim was over the age of twelve—life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Second, it is noted that the June 30, 2021 sentencing minute entry does not reflect that defendant's conviction was for a crime of violence.  La. C.Cr.P. art. 890.3(5) lists aggravated or first degree rape as a crime of violence, which shall always be designated by the court in the minutes as such.  Therefore, we remand to the trial court and order that the trial court correct the minute entry to designate that defendant's conviction was for a crime of violence.  *See State v. Thompson*, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1273, *writ denied*, 18-2077 (La. 9/6/19), 278 So.3d 372.

## DECREE

For the foregoing reasons, we affirm defendant's conviction and sentence. We also remand with instructions for the trial court to correct the minute entry to designate that defendant's conviction is for a crime of violence and to inform defendant of the registration requirements for sex offenders by sending written notice to defendant and to file proof in the record that he received such notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
INTERIM CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **NOVEMBER 2, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 21-KA-733

### E-NOTIFIED
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE E. ADRIAN ADAMS (DISTRICT JUDGE)
MONIQUE D. NOLAN (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          BERTHA M. HILLMAN (APPELLANT)

### MAILED
TOBE LAWRENCE, JR. #761394
(APPELLANT)
LOUISIANA STATE PENITENTIARY
ANGOLA, LA 70712

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
LINDSAY L. TRUHE (APPELLEE)
DISTRICT ATTORNEY
ZACHARY L. GRATE (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053